UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                             :

**PENNANT MASTER FUND LP, and
PENNANT WINDWARD MASTER FUND, LP**,  :  No.
                             :

         Plaintiffs,  :

                             :    **COMPLAINT FOR VIOLATIONS**
         v.  :    **OF THE FEDERAL SECURITIES**
                             :    **LAWS AND THE COMMON LAW**

**SIGNET JEWELERS LIMITED, MICHAEL**  :
**BARNES, RONALD RISTAU, MARK LIGHT,**  :
**VIRGINIA DROSOS, and MICHELE**  :    JURY TRIAL DEMANDED
**SANTANA,**  :
                             :

         Defendants.  :
-------------------------------------------------------------x

Plaintiffs Pennant Master Fund LP, ("Pennant Master"), and Pennant Windward Master Fund, LP ("Pennant Windward" and with Pennant Master, "Plaintiffs") are investment funds that purchased the common stock of Defendant Signet Jewelers Limited ("Signet" or the "Company"). Plaintiffs, through their undersigned attorneys, by way of this Complaint and Jury Demand, sue Signet and certain of its former executives, Michael Barnes (Signet's former Chief Executive Officer ("CEO")), Ronald Ristau (Signet's former Chief Financial Officer ("CFO")), Mark Light (Signet's former CEO), and current executives Virginia Drosos (Signet's CEO), and Michele Santana (Signet's CFO) (collectively, the "Executive Defendants" and with Signet, "Defendants"). Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon the investigation conducted by and through counsel, which included, among other things, the review and analysis of: (i) the Fifth Amended Class Action Complaint for Violations of the Federal Securities Laws filed in *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.) (the "Class Action Complaint"); (ii) the Decision and Order Denying Defendants' Motion to Dismiss the Fifth Amended Class Action Complaint in *In re*

*Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.) (the "Motion to Dismiss Opinion"); (iii) other filings in *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.) (the matter being referred to generally as the "Class Action"); (iv) transcripts, press releases, news articles, and other public statements issued by or concerning Signet and the Executive Defendants; (v) research reports issued by financial analysts concerning the Company; (vi) reports and other documents filed publicly by Signet with the U.S. Securities and Exchange Commission ("SEC"); (vii) Signet's corporate website; and (vi) other publicly available information.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiffs bring this action under the federal securities laws and under the common law to recover the investment losses they suffered as a result of false and misleading statements that Signet and its executives made to induce Plaintiffs to purchase the common stock of Signet. Defendants' misrepresentations to Plaintiffs caused Plaintiffs to suffer significant investment losses when the truth was gradually, but only partially, revealed and the price of Signet's common stock fell as a result.

2.      Defendants qualitatively misrepresented the health and careful management of Signet's credit portfolio. Signet also misrepresented the quantitative aspect of its credit portfolio, using the recency method for aging accounts to materially understate Signet's loan reserves, and thereby overstated earnings.

3.      Signet touted its credit portfolio as "strong"; "very strong"; "very healthy"; "robust"; "very stringently controlled"; "very stringently managed"; "conservatively managed"; "highly disciplined"; with "qualified customers"; and "effective" and "consistent" underwriting; that "minimized risk".  This was false or misleading.  Signet also left a misleading picture for investors in discussing its loan reserves.  Signet knew (or should have known) that Signet's reserves did not account for losses that it was likely to incur and that its reserve figures provided a misleading picture of its credit portfolio and underwriting practices.

-2-

4.      Signet is the world' largest specialty jewelry retailer with retail brands including Jared, Kay Jewelers and Zales.  Through an in-house consumer credit program, Signet extended credit to its customers for their jewelry purchases.  As detailed herein, Defendants held Signet out to the investing public as a "prudent" lender that made high- quality loans according to "stringent" credit criteria. Unbeknownst to Plaintiffs, Signet was actually a reckless subprime lender that had systematically built a massive portfolio of high-risk consumer loans.  As the truth about Signet's credit portfolio began to be revealed to the market, the price of Signet's stock fell.

5.      Signet's consumer credit operation was of vital importance to the Company and its investors.

6.      During the Relevant Period[1], Signet's loan portfolio grew to approximately $1.7 billion and was the second largest asset on the Company's balance sheet. Defendants stated that the loan portfolio was critical to Signet's business because it increased sales, built customer loyalty, and incentivized repeat purchases.  On numerous occasions during the Relevant Period, Defendants emphasized that Signet's lending operation was a "competitive advantage" that boosted Signet's financial performance and distinguished the Company from its peers.

7.      Given the significance of Signet's lending operation, Defendants repeatedly assured investors that they paid close attention to the Company's underwriting and the credit quality of the portfolio.  Signet would often discuss its in-house consumer credit program on investor calls.  For instance, Defendant Michael Barnes, Signet's former CEO, stated that the credit portfolio was "a big important part of our business and one that we don't take lightly. We watch it very closely and we use it to really help drive the core of our business."  Defendant Ronald Ristau, Signet's former CFO, further stated that "we ... fully understand the credit risk and profitability of our decisions."

---

[1] The "Relevant Period" referred to herein is August 29, 2013, to June 2, 2016.  As pled herein, Pennant pleads all misrepresentations from March 27, 2014 forward as part of its federal claims, disclaiming misrepresentations prior to March 27, 2014 solely as to its federal claims; and pleads all misrepresentations from August 29, 2013 forward as part of its state law claims.

8.      Prior to and during the Relevant Period, Defendants significantly expanded the loan portfolio, thereby fueling substantial sales growth for Signet.  Defendants repeatedly assured investors that this sales growth was being undertaken in a safe and responsible way. Based on their close familiarity with the lending operation, Defendants represented that the Company's underwriting was strict, and the credit quality of its loan portfolio was very strong.

9.      Bolstering these representations, in Signet's financial statements, Defendants consistently reported small loan loss reserves for the portfolio, which signaled to investors that the portfolio was, in fact, healthy and stable.  As alleged herein, these low reserve levels were enabled by Defendants' use of "recency" accounting – a controversial and disfavored form of counting delinquent loans, under which a loan may be considered current even if the borrower does not make the contractually required payments.  Signet used the recency methodology to obscure the quality of, and mask the true losses embedded in, its credit portfolio.

10.      Due to Defendants' expansion of the credit portfolio and Signet's resulting sales growth, Defendants consistently reported favorable financial results. Indeed, Signet met or exceeded analysts' earnings estimates – often by just a hair – for much of the Relevant Period. Defendants lauded the Company as "a prudent, measured and profitable growth story."

11.      Based on Defendants' statements and the Company's ostensibly stellar financial results, analysts repeatedly issued buy recommendations for Signet stock, reporting that "credit [is] a competitive advantage for Signet," and that the portfolio was "stable and healthy" and "high-quality."

12.      However, during the fall of 2015, after Signet surprisingly reported disappointing financial results, certain analysts and investors began questioning whether Signet had been generating significant amounts of risky loans in an effort to drive its sales to an unsustainable degree.  They also criticized Signet's use of the recency method, and questioned whether it was obscuring the true credit quality of the loan book.

13.      In response to these concerns, Defendants "doubled down" on their prior assurances. Defendants vehemently denied that the concerns were legitimate, with the Company's

Vice President of Investor Relations dismissing them as "bullying" from a few investors and assuring the market that Signet was "one of the great retail businesses of our time."

14.     Likewise, the Company's then-CEO, Defendant Mark Light, and current CFO, Defendant Michele Santana, mounted a staunch public defense of Signet's lending operation. They repeatedly assured investors that the Company's credit quality remained strong, that its underwriting remained conservative, and that the "extremely profitable" loan book remained a "competitive advantage." In a nutshell, Defendant Light stated that the "concerns about our credit portfolio" were "unwarranted, quite frankly."

15.     This was all false (or at least grossly misleading). Contrary to Defendants' statements, Signet's loan portfolio was rife with toxic credits that posed a material risk to the Company. Unbeknownst to investors, approximately 45% of Signet's loan portfolio consisted of subprime loans.

16.     The truth about Signet's troubled loan operation would leak into the market over time. For example, on May 26, 2016, Defendants announced that the Board had authorized "a strategic evaluation of the Company's credit portfolio," and had hired a third party, Goldman Sachs, to run the review. Defendants acknowledged that they were considering a sale of the portfolio and a complete outsourcing of the credit operation – a revelation that was at odds with their statements, made just weeks prior, that the high-quality portfolio was a key competitive advantage for Signet.  Surprised analysts noted the discrepancy, reporting, "From listening to management's script . . . , you would never have imagined that the company would need to commission a 'strategic evaluation' of the segment." On May 26, 2016, Signet's stock price swiftly declined, falling more than 10% in a single day on very high trading volume.

17.     And on June 2, 2016, Grant's Interest Rate Observer published an article titled "Lending Clubbed" that suggested Signet was an overvalued consumer credit company and that its consumer portfolio may contain significant amounts of risky loans.  This further leaked information into the market regarding Signet's risky loans – but did not reveal anything close to the full truth.

18.     Pennant purchased hundreds of millions of dollars of Signet stock from March 7, 2014 through the June 2, 2016 disclosure.  Subsequent events confirmed that Signet had been engaging in a credit quality charade for years.

19.     Post-Relevant Period events, confirming the falsity of Signet's prior representations include:   Signet's eventual revelation that its sales had been dramatically impacted by its credit tightening (despite its supposedly having 'conservative' standards all along); that its credit portfolio was worth nowhere near what Signet was carrying it for; the Consumer Financial Protection Bureau ("CFPB") was investigating the Company; and the New York Attorney General was investigating the Company.

20.     Signet's misrepresentations cost Plaintiffs tens of millions of dollars.  During the time Pennant invested in Signet stock, Signet traded as high at $150 a share; by June 3, 2016, almost half that value was destroyed.

## JURISDICTION AND VENUE

21.     The claims asserted herein arise under and pursuant to Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78r and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under state common law.

22.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.  Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.

24.     Signet regularly made presentations in this District which included the dissemination of false and misleading information.  On information and belief, Signet made presentations in this District on at least the following dates: September 10, 2013; October 8, 2013; April 1, 2014; April 10, 2014; June 24, 2015; March 29, 2016; and June 1, 2016.  Further,

on information and belief, in each presentation Defendants either made false or misleading statements, or failed to disclose the falsity of prior statements or misleading nature of prior statements, despite discussion of the company and its credit portfolio.  Analysts at Pennant regularly attended conferences in New York, including conferences where Signet presented, and heard or read statements by Signet in New York.

25.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

## THE PARTIES

26.     Plaintiff Pennant Master Fund, Ltd. is a Cayman Islands partnership located at 535 Springfield Avenue, Suite 120, Summit, NJ 07901.  The dates on which Pennant Master purchased or acquired Signet common stock during the Relevant Period are attached hereto as Exhibit A.

27.     Plaintiff Pennant Windward Fund, Ltd. is a Cayman Islands partnership located at 535 Springfield Avenue, Suite 120, Summit, NJ 07901.  The dates on which Pennant Windward purchased or acquired Signet common stock during the Relevant Period are attached hereto as Exhibit B.

28.     Plaintiffs are managed by a common manager, Pennant Capital Management LLC ("Pennant"), which is located at 535 Springfield Avenue, Suite 120, Summit, NJ 07901.

29.     With respect to Plaintiff Pennant Windward, in addition to purchases on the open market, on December 1, 2015, Pennant Windward acquired or was assigned ownership (for value) of shares from a formerly extant fund managed by Pennant (the "Transferred Shares"). The dates of original purchase of the Transferred Shares by the transferor fund are also provided in Exhibit B.

30.     Defendant Signet Jewelers Limited is a Bermuda corporation with headquarters located in Akron, Ohio and with its Corporate and Distribution facility located in Irving, Texas.

Signet is purportedly the world's largest retailer of diamond jewelry. The Company wholly owns Sterling Jewelers, Inc. ("Sterling"), through which it operates retail stores under the brand names Kay Jewelers ("Kay") and Jared The Galleria of Jewelry ("Jared"), among others, as well as its in-house credit operation. The Company also wholly owns Zale Corporation, through which it operates retail stores under brand names including "Zales The Diamond Store" ("Zales") and "Piercing Pagoda."

31.     Defendant Michael Barnes ("Barnes") served as Chief Executive Officer and as a Director of Signet from January 2011 until October 31, 2014.

32.     Defendant Mark Light ("Light") was the Chief Executive Officer ("CEO") and a Director of Signet during the Relevant Period. Light became CEO and a Director of Signet on November 1, 2014. Prior to becoming CEO of Signet, Light served as President and Chief Operating Officer of Signet and CEO of its Sterling Jewelers division, and held senior leadership positions with Signet and the Sterling division for over 25 years. According to the Company's website, Light "has broad and deep knowledge of Signet's business and the jewelry industry" and "has extensive knowledge of Signet's operations." Light resigned on July 31, 2017 and was replaced by Virginia Drosos ("Drosos") on August 1, 2017.

33.     Defendant Ronald Ristau ("Ristau") served as Chief Financial Officer ("CFO") of Signet from April 2010 until July 31, 2014.  On information and belief, Ristau resides in the State of New York and resided in the State of New York during the Relevant Period.

34.     Defendant Michele Santana ("Santana") became CFO of Signet on August 1, 2014, and continues to hold that position.

35.     Defendant Drosos became CEO of Signet on August 1, 2017, and continues to hold that position.

36.     Barnes, Light, Ristau, Santana, and Drosos are collectively referred to herein as the "Executive Defendants." The Executive Defendants, because of their high-ranking positions and direct involvement in the everyday business of Signet and its subsidiaries, directly participated in the management of Signet's operations, including its public reporting functions, had the ability to,

and did control, Signet's conduct, and were privy to confidential information concerning Signet and its business, operations and financial statements, as alleged herein.

37.    Signet and the Executive Defendants together are sometimes collectively referred to herein as the "Defendants."

## SUMMARY OF THE FRAUD

### A.    Signet's Consumer Lending Portfolio Was Critical To The Company's Value, And Was A Key Focus Of The Market And Defendants

38.    Prior to and during the Relevant Period, a key part of Signet's business was its consumer lending operation. While Signet's competitors generally offered credit-financed sales through third party underwriters, Signet operated an in-house credit business run through its Sterling division. By 2015, Signet's total credit-financed sales (that is, sales financed through the use of in-house credit) had grown to 61.5% of total sales, or $2.45 billion.  The Company's outstanding receivables balance had risen to $1.85 billion, or more than double its 2008 levels and triple its 2004 levels. The lending portfolio's receivables grew to be Signet's second-largest asset by 2015. More than one-third of Signet's operating income came from its in-house consumer finance program.

39.    In numerous investor conference calls and investor presentations before and throughout the Relevant Period, Defendants repeatedly stressed that the lending operation and loan portfolio were extremely important to the Company's business and financial performance, in major part because the lending operation increased sales and thus was a key driver of revenue for the company.

40.    For example, during an October 8, 2013 New York Analyst Day, then-CEO Barnes touted Signet's in-house customer finance operation, emphasizing "how valuable that is to our Company because it's powerful and it really drives our business and we have a very large percentage of sales that use our in-house customer financing. So that's a huge competitive advantage for us." Similarly, during a September 4, 2014 Goldman Sachs Global Retailing Conference, Defendant Santana described the Company's credit operation as "a key enabler of our

sales," and "as one of the competitive advantages we have." Indeed, Defendants opened their discussion of the Company's credit portfolio on nearly every earnings call during the Relevant Period with a statement that the lending operation was a "competitive advantage." In total, Defendants described Signet's in-house credit operation as a "competitive advantage" no fewer than 20 times over the course of the Relevant Period.

41.     The lending operation was especially important to driving sales in the bridal category, which comprised 60% of the Sterling division's credit sales and was its most important segment. According to the Company, credit penetration in the bridal category could reach 70%.

42.     Based on Defendants' statements, analysts repeatedly issued reports stating that the lending operating was a key differentiating feature that boosted the value of Signet's shares. For instance, on January 29, 2014, Miller Tabak & Co., LLC reported regarding Signet's credit portfolio:

> A competitive advantage, it's proven, self-funding and integral to the primary business goal, i.e., the sale of fashion and diamond jewelry[.] The high-quality credit portfolio is specifically designed to help customers make jewelry purchases (primarily bridal) and keep them coming back for add-on purchases.

The same report likewise concluded that it was unlikely that Signet would ever consider a sale of its credit operation considering the edge it gave the Company over its competitors. Buckingham Research Group similarly reported on December 19, 2014 that Signet's "proprietary credit card is probably one of its most important competitive strengths as it helps drive sales."

43.     Given the importance of the lending operation to Signet's financial performance and value, along with its sheer size, it was a significant focus of the market's attention during the Relevant Period – as evidenced by numerous investor questions during earnings calls relating to the Company's credit business. Signet was well aware of this fact. As Ristau stated during Signet's New York Analyst Day on October 8, 2013, "Well, I couldn't do a presentation without talking about credit." As explained further below, Defendants addressed this subject in detail in dozens of investor calls and presentations during the Relevant Period, and analysts issued hundreds of reports concerning Signet's lending operation.

44.     In light of the market's focus on the credit operation, Defendants repeatedly stated that they paid close attention to the lending operation and the health of the portfolio, and had personal knowledge of these subjects. For example, during the September 10, 2013 Goldman Sachs Global Retailing Conference, hosted at the Plaza Hotel in New York, New York, Defendant Barnes stated that the credit portfolio was "a big important part of our business and one that we don't take lightly. We watch it very closely and we use it to really help drive the core of our business." During the October 8, 2013 New York Analyst Day (hosted in New York, New York), Defendant Ristau further stated that the Company "welcome[s] the increasing use of our credit programs, as we have very definitive approval criteria and fully understand the credit risk and profitability of our decisions. We take great care in our decisions[.]"

45.     Defendants bolstered these representations in their SEC filings. Defendants stated in Signet's Form 10-Ks that "on an ongoing basis, management monitors the credit exposure based on past due status and collection experience." Signet's Form 10-K filed in February 2014 provided that subsequent to a customer's initial finance purchase, "Signet monitors the credit quality of its customer finance receivable portfolio based on payment activity that drives the aging of receivables. This credit quality indicator is assessed on a real-time basis by Signet." Likewise, in its Form 10-K for fiscal 2016, Signet stated that, "We closely monitor the credit portfolio to identify delinquent accounts early[.]"

**B.     As The Credit Portfolio Increases In Size To Drive Sales, Defendants Repeatedly Assure Investors That Their Underwriting Is Conservative And Credit Quality Is Strong**

46.     Prior to and during the Relevant Period, Defendants expanded Signet's in-house credit program to drive sales. The Company's credit penetration rate and the size of the loan portfolio grew to record heights during the Relevant Period. For example, from the beginning of the Relevant Period to the end of 2016, the credit penetration rate rose from 60.4% to a high of 66.8%. Similarly, the Company's accounts receivable grew from $1.15 billion in the beginning of the Relevant Period to $1.86 billion by the first quarter of fiscal 2018.

47.     Defendants' expansion of the Company's credit portfolio in turn caused the Company to experience enormous sales growth. For example, at the very beginning of the Relevant Period, Signet reported second quarter fiscal 2014 total sales of $880.2 million. By the second quarter fiscal 2015, the Company reported total sales of $1.2 billion, followed by total sales of $1.4 billion in the second quarter fiscal 2016.

48.     As the Company's sales grew, Defendants repeatedly told investors that their underwriting remained conservative and that the credit quality of the portfolio remained healthy and strong. For example, during an August 29, 2013 earnings call, Defendant Light stated that Signet's

> overall credit portfolio statistics continue to remain very strong and I want to make sure that you understand that point. [] Consumers are behaving strongly. They are making more than the minimum down payments very strongly. They are using credit appropriately. Our credit approval rates remain relatively consistent to prior year, so there is no big change in anything that we are doing there.

49.     Similarly, on September 10, 2013 during the Goldman Sachs Global Retailing Conference, Defendant Ristau stated that there had been no "change in the quality of the portfolio or consumer behavioral changes.  That has all been very, very strong and the portfolio continues to be very healthy."  Ristau further stated that Defendants "don't push the credit, we don't change the way that we measure in terms of 'do you get credit, do you not get credit.' We will never cross that line. But because of the fact that it is so well-managed we're still gaining a lot of traction, bringing in a lot of new customers."

50.     During the same conference, Defendant Ristau assured investors that Defendants were intimately familiar with the credit operation, and the Company's underwriting was "stringent" and "conservative," stating:

> Okay, well, the credit business, as I am sure you are all aware, we believe is a competitive advantage of our business. We do run our own credit operation. We are very, very strong operators of that particular segment of our business, we have been at it for 40 or 50 years, we are best in class operators of running a private label credit operation.

> So it is very stringently controlled, it is a very important part of our business particularly as it helps to facilitate the sale of the bridal product. . . . So it is a very important part of our business, it is very well managed, it is very conservatively managed. From a credit granting perspective about 50% of the people who apply for credit are granted credit. So it is very stringently managed from a credit criteria perspective.

51.     Whenever the Company's provision for bad debt ticked upwards, Defendants assured investors that the increase was not due to credit deterioration. Specifically, Defendants stated that the increasing bad debt provision was driven by the fact that the portfolio was increasing in size, thus requiring an increasing provision automatically. Defendants further stated that this provision was "more than offset" by the increased levels of interest income generated by the larger portfolio – resulting in a net benefit to Signet – and that credit continued to be "profitable" and "integral to enabling sales in the business[.]"

52.     For example, on October 8, 2013, Defendant Ristau noted that the "net impact" of these items – *i.e.*, bad debt expense and interest income – "was an increase of $19.3 million in operating income. . . . So our message here is credit is profitable . . . ." Defendants made substantially similar disclosures throughout the Relevant Period.

53.     Analysts issued reports adopting this understanding and continued to report that they had no concerns regarding Signet's credit portfolio.  For instance, following Signet's August 29, 2013 earnings call, Deutsche Bank reported that "although bad debt as a percentage of sales rose YoY, management said they have seen no deterioration in customers' ability to re-pay, and indeed profits from credit rose YoY." On August 30, 2013, Stephens reported that it viewed Signet's "credit portfolio as healthy despite an uptick in bad debt expense," which was "attributed to higher receivables and is being offset by higher interest income on those receivables." In September 2013, Stephens reported that Signet's bad debt increase was "due to a higher credit penetration as more consumers are buying on credit. This was mostly offset by higher interest income earned on a higher receivables balance. Its underwriting terms have not changed."

54.    In April 2014, the Company made certain unspecified changes to its credit decision engine. These changes further increased the Company's credit penetration rates; that is, they resulted in Signet granting more credit.

55.    Soon thereafter, on July 1, 2014, Signet issued a press release notifying the public that Defendant Ristau would resign from his position as CFO effective July 31, 2014, and that Defendant Santana would replace him following his departure. During an August 28, 2014 earnings call, Defendant Santana assured investors that the changes to the Company's credit decision engine would not adversely affect the credit quality of the portfolio. Defendant Santana stated that these changes "preserve[] credit requirements, but more accurately score applicants, which yields more qualified customers." According to Santana, the changes were meant to "increase credit penetration without adversely affecting the net impact of bad debt." In November 2014, Defendant Light replaced Defendant Barnes as CEO.

56.    At the same time Defendants were making these statements, they also reported in their SEC filings that the credit portfolio did not pose a material concentration of credit risk. For example, each of Signet's Form 10-Qs stated that "[m]anagement does not believe Signet is exposed to any significant concentrations of credit risk that arise from cash and cash equivalent investments, derivatives or accounts receivable."

57.    Meanwhile, Defendants kept the Company's publicly reported loss reserves at very low levels. This communicated to the market that only a very small percentage of the debt was likely to default, and therefore that the portfolio was strong. Further, because bad debt was charged against income dollar for dollar, keeping reserves low allowed Signet to report higher income.

58.    Notably, Signet used a rare and disfavored form of accounting – "recency" accounting – that effectively suppressed the number of accounts considered delinquent. This method of "aging," or determining the delinquency of accounts receivable, is not standard. The most common method of aging the delinquency of accounts receivable is the "contractual" method, whereby an account is current only if the account holder is paid in full under the contractual terms of the loan. In contrast, Signet's accounting methodology counted an account as "current" even

when a customer had missed a payment – or several of them – so long as the customer recently had made a single "qualifying payment" of a minimum amount which could be less than the amount due. The Federal Reserve has explained in its Bank Holding Company Supervision Manual that "banks and their consumer finance subsidiaries are required to use the contractual method," and that, while "uninsured, non-bank consumer finance subsidiaries" of bank holding companies are permitted under GAAP to employ recency accounting, "[i]n general, the contractual method provides a more accurate reflection of loan performance and, therefore, is the preferred methodology, especially from the standpoint of financial-statement transparency and public disclosure."

59.     Specifically, Signet permitted customers to make partial payments – as little as 75% of the monthly contractual agreed upon amount – for the account to be considered current under Signet's recency method, even though such account would not be current under the contractual method. Thus, for example, if a customer had failed to make any payment for 90 days, the account would nevertheless "reset" and be considered current if the customer subsequently made one minimum partial monthly payment: the customer did not need to pay the past due amount to be considered current under Signet's accounting methodology. This aging methodology enabled Defendants to avoid disclosing to the market the amount of money owed to Signet that was actually past due because it deferred the identification of accounts as delinquent.

60.     During the Relevant Period, Defendants also used the Company's reserve levels as a signal to investors that the credit portfolio was healthy. For example, Santana stated during a March 26, 2015 earnings call that "the portfolio continues to perform very strongly for us and that's evidenced by the allowance as a percentage of our ending accounts receivable finishing nearly flat to last year." Similarly, during a May 28, 2015 first quarter earnings call, Defendant Santana stated that, "Our portfolio continues to perform well as evidenced by the [positive] net impact of bad debt and other operating income as well as the allowance as a percentage of accounts receivable being fairly consistent."

61.     Significantly, by keeping the allowance low, the Company was also able to consistently meet earnings estimates (by avoiding charges against its income that would have been required if the reserves were raised).

62.     Analysts often lauded the Company's performance and issued "buy" recommendations for its stock. For example, on August 27, 2015, Buckingham Research Group issued a BUY rating for the Company, noting that its recent earnings beat consensus estimates "on a better than expected same store sales increase[.]" Similarly, on September 1, 2015, UBS issued a report stating that Signet is "still shining bright," and highlighting that the Company's EPS "was well ahead of management guidance." On October 21, 2015, Wells Fargo named Signet its "top pick in our universe" and placed it on the Priority Stock List.

63.     As a result of Defendants' false and misleading statements during the Relevant Period, Signet's stock price became artificially inflated.

**C.     Contrary To Defendants' Statements, Signet Had Engaged In High-Risk Lending Practices To Drive Loan Volume, Thus Filling Its Credit Portfolio With Huge Amounts Of Toxic Loans**

64.     Unbeknownst to investors, in order to expand the Company's lending operation, Signet had engaged in reckless underwriting through which it routinely extended credit to high-risk borrowers – the precise opposite of the "conservative" practices Defendants touted. As a result of its reckless underwriting, the Company's loan portfolio contained a material amount of high-risk loans that were likely to default in significant numbers, contrary to Defendants' statements that the credit quality of the portfolio was "strong." Numerous former Signet employees confirmed that Signet engaged in high-risk lending practices to increase sales.

65.     The Class Action Complaint ("CAC") cites Former Employee 1 as a person who worked at Signet from January 1999 until February 2014. According to the CAC:

> Former Employee 1 began in the collections department and rose through the Company. Former Employee 1 began working in the credit risk department in 2009 as a Project Manager/Business Analyst before becoming the Director of the Credit Information Technology and Strategy Department in 2011. Former Employee 1

was involved with designing the Company's credit scoring system called "score card" in approximately 2005 or 2006. Later, as the Director of the Credit Information Technology and Strategy Department, Former Employee 1 was responsible for all technological aspects of the Company's credit business, including system management, infrastructure, and data analytics. Former Employee 1 reported to Mario Weiss, who was Signet's Senior Vice President of Credit Operations from 1990 to 2016.

66.    According to the CAC:  when told that the Company said its credit portfolio was conservatively managed and subject to stringent underwriting, Former Employee 1 said, "I whole heartedly disagree. It's a running joke in Akron that it's very easy to get credit at Kay Jewelers or Jared. If you ask any college student or young adult where they got their first credit card, 90% will tell you one of those places. There were situations where applicants' jobs weren't verified. Stores would just lend to anyone, even with very bad credit. We would review applications in the collections department after the accounts had gone delinquent and they were a joke. There were people with six charge- offed credit cards and two bankruptcies getting a $2500 credit line. One applicant listed his telephone number as 12345678910. The application went through with no problems. We only found it when we were trying to add his account to the predictive dialer and it wouldn't work." Former Employee 1 further explained, "That's a complete lie. The extension of credit is not stringent at all. There's no strict rules there."

67.    According to the CAC:  Former Employee 1 reported that the Company's credit portfolio did not collapse suddenly. Rather, according to Former Employee 1, the high levels of bad debt in the portfolio and resulting problems were well known within the Company dating back to at least 2008: "There were signals going all the way back to 2008 that the credit department had some major issues with the bad debt process, with how it used recency methods and causing major cash flow issues." Former Employee 1 reported that the biggest issue with the portfolio was the growing gap between total sales and real cash flow.

68.    According to the CAC:   Former Employee 1's responsibilities included conducting daily or weekly gap analyses of the differences between sales numbers and real cash flow within the Company. As Former Employee 1 explained, this "gap" arose from granting

credit to borrowers with low or no credit history, who could afford only very low monthly minimum payments. For example, Former Employee 1 explained, by taking someone fresh out of college with no credit, giving him a $2,000 limit, and making the monthly payment only $25 per month, the Company would be able to show a great number from a sales perspective. However, from a true cash flow perspective, this was problematic. The money that the Company reported as revenue wasn't really there. Former Employee 1 explained that this question of sales numbers versus real cash flow was always a question from outsiders, including investors. Internally, the credit department was performing constant analyses, and this gap between sales totals and real cash was the number one analysis they did.

69.    According to the CAC:  Former Employee 1 also stated that Signet's recency method of accounting allowed the gap between outstanding account balances and real cash flow to grow. The Company had many customers who were between thirty and ninety days delinquent. They would make smaller monthly payments, and the Company would charge them interest. From a recency perspective, and the Company's perspective, the customers were still current even though they were paying only $25 per month. However, these small monthly payments were eaten up by interest, so the customers' actual account balance kept increasing. Further, because customers were current, they were able to purchase more merchandise on their credit line. Thus, even if the customer is still paying $25 or $30 per month, the gap between the account balance and the amount actually being collected continues to grow.

70.    According to the CAC: Former Employee 1 strongly disagreed with the notion that the bad debt increase Signet experienced was an "all of a sudden thing." Former Employee 1 reported that employees in the credit risk department began issuing internal warnings as far back as 2007 or 2008 that the bad debt issue was a problem and the portfolio was in trouble, but nothing was really done.

71.    According to the CAC: Former Employee 1 reported that this issue and other negative trends in the credit portfolio were communicated to senior Signet executives, including Defendant Light. Former Employee 1's department would identify negative and positive trends in

the credit data. In addition to the cash flow problem, one of the key negative trends was the rate of customer contacts for collection compared with the number of attempts to contact them. The lower that rate became, the greater the cash flow decrease associated with collections. These types of reports would then be written up and sent to Former Employee 1's peers and other executives in the credit department, and ultimately shared with Defendant Light and Bob Trabucco, the chief financial officer of Sterling Jewelers. Former Employee 1 reported that there would be regular bad debt meetings with the executives, including Light and Trabucco, to discuss strategies to overcome expanding bad debt, low contact rates, and similar issues.

72.    According to the CAC: Former Employee 1 said that the question in meetings was always, "Do we change our lending practices and alienate a large portion of customers that would not qualify for more stringent credit terms?" The overarching opinion was that, if the Company tightened its underwriting, Sterling would lose a significant number of customers from a buying power perspective.

73.    According to the CAC: Former Employee 1 reported that it was an internal joke that the Company was going to have a discussion about changing the lending program every October, which was the month prior to the high increase in sales during the holiday season. Former Employee 1 reported that, "It was like we thought about changing the lending program but here comes the holidays so those high sales numbers will cover the smell of the bad debt." According to Former Employee 1, everyone at the Company knew that eventually the Company was going to have to change its lending practices because it was going to fall apart, which indeed eventually happened to Sterling. Former Employee 1 reported, "There was always that piano hanging above everyone's heads, but the performance of the sales during the holidays hid the smell for the most part. That's why you'd see that sales versus cash flow gap continuing to grow. Maybe from the outside it looked like all of a sudden, but if you look at the internal trends you could see the issue going back as far as 2007 or 2008."

74.    According to the CAC: At the bad debt meetings, loan loss reserves were discussed. Former Employee 1 said that these discussions about the loan loss reserves included

Light, Trabucco, and Weiss – both of whom reported to Light – and other representatives from the executive team in the credit department

75.     According to the CAC:  Former Employee 1 said there were discussions that the reserves were low, but that nothing was done because "the reserving had to be under a certain amount." Specifically, according to Former Employee 1, at these meetings, the executives decided not to raise reserves to a more appropriate level because reserves were "comped" to the prior year's level precisely to avoid a significant increase. As Former Employee 1 explained, the discussion at these meetings centered on the fact that "the reserves are low but there's not much we can do about it because we're comping to the numbers last year." Former Employee 1 stated that the concern with raising the reserves too much was that it would hurt the Company's "bottom line."

76.     According to the CAC: Former Employee 1 would also listen in to investor calls. As Former Employee 1 recalled, the number one topic that always came up was the bad debt. Defendant Light, or whoever was speaking for the Company, would typically represent that "the bad debt was manageable, the credit portfolio was okay, and there were no plans on changing Signet's recency method because that's what gave the Company its competitive advantage." But Former Employee 1 knew from the trend analyses that the recency method had to be modified, or at least scaled down so the cash flow was more equitable to the sales numbers. Yet that reconciliation never happened and only got worse.

77.     According to the CAC: Former Employee 1 characterized Light's remarks on the calls as "spin." For instance, as Former Employee 1 described, Light would represent that the credit portfolio is doing fine, and would explain to investors all these indicators the Company looks at showing the trends were moving in a positive direction. But Light was not mentioning all of the negative trends that Former Employee 1 and his team were looking at. Former Employee 1 said that internally, discussions about bad debt were very different than they were on the investor calls. That was one of the reasons Former Employee 1 finally decided to leave the

Company. Former Employee 1 held significant positions at Signet for thirteen years and saw the direction the Company was going in, especially at the executive level.

78.     According to the CAC:  Numerous former employees reported that the Company forced its sales representatives to aggressively push credit on customers, even those who did not want it, by requiring them to meet minimum daily quotas for credit applications, and disciplining employees or firing them when they did not meet these quotas. Former employees also reported that the Company was extremely lax in granting credit to customers, even those who appeared to be high- risk, such as those with bankruptcy or late fee histories.

79.     Public internet postings, including on indeed.com by persons stating they were former Signet employees (employees of Kay, Jared, Zales, and similar) confirm the accounts of former employees in the Class Action Complaint.  Former employees report a culture pushing credit, regardless of the credit quality of the consumer.

80.     According to the CAC:  Former Employee 2 worked for the Company as a sales associate at Kay and Belden stores from approximately 2012 to 2014 in Massena, New York. Former Employee 2 reported that the Company was extremely strict about its quota for getting credit applications. Former Employee 2 was required to obtain one credit application for every day Former Employee 2 worked. If you worked five days in a week, you had to get five credit applications. This was a very harsh requirement, especially in the mall Former Employee 2 worked at, which was small. Former Employee 2 reported that the Company would make staff stand out in the mall hallway and essentially beg people for credit applications "or else we'd get fired." The Company was "very, very, very dominant about getting credit applications," Former Employee 2 reported. "We needed credit, credit, credit, and that was our downfall in our [Belden] store, anyway," said Former Employee 2. Former Employee 2 reported that sales staff were judged by six standards, including the quota of one credit application per day, sales goals, upselling on warranties and service plans, among others. If a sales associate failed to meet their credit application quota for a month, they would get fired.

81.     According to the CAC:  Former Employee 3 worked for the Company as a sales associate at the Jared store in Fort Lauderdale from January 2014 to April 2017. Former Employee 3 reported that Former Employee 3 was required to procure one half of a credit application per day. Because a lot of potential customers already have credit, "you were really going out of your way to get [new credit applications]." Former Employee 3 stated that getting credit applications was very important for promotions. "You heard 'credit is king' every day; that's what was written on the daily goals sheet. They pushed credit more than they pushed sales," said Former Employee 3. Former Employee 3 further stated that Jared's "credit was pretty easy to get. They gave credit to people I wouldn't have let take my car around the block. They gave credit to just about everybody." According to Former Employee 3, the only time the Company would not give credit was if the applicant had not paid the Company in the past. Former Employee 3 said, "It's the culture of getting credit, and as long as it's extended, you have to sell. You've got to do it."

82.     According to the CAC:  Former Employee 4 was a district training captain at Ultra Diamonds, and moved over to Sterling when Ultra was acquired in 2012. Former Employee 4 was a District Manager in Training at Sterling until leaving the Company in March 2015. Former Employee 4 reported that every employee was held to standards of production, and one of them was the number of credit applications they generated. Based on whether an employee was full time or part time, a determination was made on what that requirement was. This was factored into promotions, demotions, and terminations. The training pieces for this standard focused on going out and getting applications rather than looking for applicants with a true need for credit or who were attractive and safe borrowers. Some store managers would have their employees walk around the mall and ask other mall employees to fill out applications just to meet their standard. The standard was either one or two credit applications per day. Sometimes it would be one or two credit applications per four or six hour block. Part time employees had to get half of whatever the full time production standard was. Managers were considered selling managers, so they were held to these standards as well. Former Employee 4 echoed that "there

were a lot of people that would say they had bad credit, and we'd still get them a $300 starter line. There was a big increase in the amount of those which are obviously riskier and more likely to default."

83.     According to the CAC:  Former Employee 5 worked for the Company from June 2008 until May 2017. At the end of Former Employee 5's tenure, Former Employee 5 was an assistant store manager in Fort Lauderdale Florida. When asked about Signet's credit program, Former Employee 5 explained that "basically anybody gets approved" and you had to have "the worst credit score in history" to be denied. Former Employee 5 said that it was "very, very easy" to get credit and that the application process took five minutes, with a decision being made within five minutes of the submission unless the individual had a security block. Former Employee 5 provided her mother as an example of the ease with which someone with poor credit would be approved through Signet's system. Former Employee 5's mother applied for credit from Signet to help Former Employee 5 meet her credit application quota. "She was doing it to help me for a quota I needed to meet," Former Employee 5 said. At the time, Former Employee 5's mother had filed for bankruptcy, was losing her home, had "tons of medical bills and a car she couldn't pay for," and as a result Former Employee 5 assumed she had an extremely poor credit score. To Former Employee 5's surprise, Signet approved Former Employee 5's mother for approximately $8,000 in credit.

84.     According to the CAC:  Former Employee 5 explained that Signet had a quota on the number of credit applications each sales associate was required to process. In the Jared division this was one half of a credit application per day, but in the Kay division it was one credit application per day. If you were unable to convince a customer to apply for credit, Signet would want you to bring in a fellow employee to try to convince the customer. The objective was to convince customers to open credit. This quota structure remained the same throughout Former Employee 5's tenure at the Company. Former Employee 5 stated that these quotas were set by corporate, and there were six standards, referred to internally as the "6 for 6 standard": sales goals, selling additional pieces during a single transaction, selling lifetime warranties on the

purchased jewelry, revenue generated by the in-store repair department, credit applications, and selling credit insurance.

85.     According to the CAC:  Former Employee 6 worked as a collector in the level 3 collections department, which collected on accounts that were 90 days past due, from 2011 until September 2014. Former Employee 6 would start the collections process by looking at the original credit applications. Former Employee 6 reported that a lot of the applications were "garbage." Former Employee 6 noted, "A lot of the times the original credit application was incomplete, either not filled out or missing the applicant's signature. I remember looking at one and in source of income it said 'stealing watches.' It was just ridiculous. I'd look at these applications and just shake my head." Former Employee 6 said that Former Employee 6's department would always laugh at the credit authorizers because it was "ridiculous how some of the people they were collecting on got approved for loans in the first place."

86.     The above statements by former employees are corroborated by the fact that the Company's borrowers did, in fact, increasingly consist of bankruptcy filers during the Relevant Period.  As stated below, in the first quarter of calendar year 2015, 1,903 bankruptcy filers named Signet as a creditor. In the months following the end of that quarter, that number jumped: 2,663 bankruptcy filers named Signet as a creditor in the fourth quarter of calendar year 2015, an increase of 29.9% over the first quarter, and 3,274 filers in the first quarter of calendar year 2016 named Signet as a creditor, an increase of 72% year-over-year.

87.     Defendants had knowledge of these facts. Bankruptcy courts notify all creditors named in a bankruptcy filing. Further, the Company stated in its SEC filings that it tracked bankruptcy petitions throughout the Relevant Period. For example, in Signet's fiscal 2016 Form 10- K, the Company's underwriting disclosures provided that:

> [A] 100% allowance [for uncollectible amounts] is made for any amount aged more than 90 days on a recency basis and any amount associated with an account the owner of which has filed for bankruptcy . . . . The allowance calculation is reviewed by management to assess whether, based on economic events,

additional analysis is required to appropriately estimate losses inherent in the portfolio.

**D.     As Signet's Hidden Credit Problems Begin To Emerge, Defendants Issue False Assurances To Quell Market Concern**

88.     As explained below, the severe credit risk created by Signet's reckless lending practices began to emerge in late 2015. Defendants promptly, falsely, reassured investors that Signet's underwriting was conservative, the portfolio was not risky, and that Signet's lending practice were appropriate – stating that the credit portfolio remained stable and healthy. These reassurances were false.

89.     On November 24, 2015, Signet issued disappointing earnings for the third quarter of 2015, which were below consensus expectations. Specifically, earnings per share were $0.33, $0.05 below the street's $0.38 estimate. Defendants revealed that higher net bad debt expense, which rose to $53 million compared to $41.7 million the year prior, had led to contracting margins and therefore to the earnings miss. This partial corrective disclosure caused investors to begin to question the credit quality of Signet's loan portfolio and, in turn, caused Signet stock to immediately fall 4%, dropping from $140.65 per share on November 23, 2015 to a closing price of $134.89 per share on November 24, 2015, on elevated trading volume of more than 4.6 million shares traded.

90.     To mitigate the impact of investor concern on Signet's stock price, Defendants made a number of false reassuring statements in response to analysts' questions on the ensuing conference call to discuss these results. For example, Defendant Santana explained that the increased net bad debt expense was not caused by deterioration, but rather by a shift in "credit mix," namely, an increase in credit being granted to Kay customers (who had a lower credit profile) relative to Jared customers. Further, Defendants claimed that because the third quarter was historically a very small one for the Company's earnings, the effect of this shift in credit mix was magnified more than it would normally have been. Ultimately, Defendants assured investors,

the Company's underwriting remained disciplined and credit quality was strong. As Santana stated:

> The credit mix shift had a notable and partially offsetting impact on operating income because our operating earnings in Q3 are less than 5% of our overall annual operating earnings, so a small shift in credit has a more noticeable impact. Our credit approval standards remain disciplined and unchanged. [] The higher participation rate was primarily driven by a greater increase of Kay customers compared to our Jared customers. [] Signet has not changed its credit standards and our credit portfolio continues to perform well and profitably.

91.     Analysts issued reports in which they credited Defendants' reassurances. Barclays reported that the higher bad debt expense "was due to mix shift to Kay vs. Jared, which has different credit metrics, but the overall state of the credit business remains in good shape." Cowen & Company likewise reported that Signet "remains highly disciplined in its approval process and its credit portfolio continues to be profitable and stable."

92.     Between the end of November 2015 and May 2016, Defendants continued to issue a series of false reassurances in which they stated that the Company's underwriting remained conservative and its credit quality was strong.

93.     Indeed, on the January 7, 2016 holiday sales call, Defendants dismissed market concern as unwarranted and reassured investors that all was well with the credit operation. For example, Defendant Light stated that

> [I]t's very important that everybody understands this. We have been running a credit portfolio for well over 30 years – well over 30 years. And we've been through good times and bad times with the recessions, and we've been able to manage our accounts receivable appropriately and arguably better than most during all times over the last 30-plus years. So – this credit, as Michele said, there's modest shifts going on, but there's nothing that's unprecedented for us. So we have every confidence in the way we manage our credit portfolio and the profitability of our credit portfolio. I just want to reinforce that because there seems to be some concerns about our credit portfolio, and – we just think it's unwarranted , quite frankly.

94.     Similarly, Santana added, "Again, just to go back, our credit portfolio remains extremely profitable. . . . So I really hope with the comments that we mentioned today, that it does help to put this credit discussion – to minimize it to where it should be." Santana added that, "In-house credit has long been an important element of Signet's success," and emphasized again that, "Our credit program offers a competitive advantage for the Company."

95.     Analysts reacted positively to Defendants' assurances; and Defendants provided even more assurances to the market.

96.     Most importantly and in response to growing investor pressure for transparency into credit metrics, Defendants promised investors that there would be new disclosures regarding the Company's credit decision-making protocol, accounting method, and credit metrics in its forthcoming March 2016 SEC filing.

97.     In addition, on February 29, 2016, Signet made a number of announcements designed to discredit its critics and boost its stock price. First, Signet took the extremely unusual step of pre-announcing its earnings for the fiscal fourth quarter 2016, which exceeded its guidance. Notably, Signet's Vice President of Investor Relations James Grant sent this preannouncement to several investors along with a note dismissing the market's concerns as "bullying" from a few investors, and lauding Signet as "one of the great retail businesses of the present time":

> Normally [we] would not pre-announce our earnings-beat unless it materially deviated from our guidance. But this is a very unique time for all of us. Please, do not consider this a new precedent or read into this in any way except for what it is: A news release to publicly show our great results which creates an open period to repurchase our stock; and to counter the bullying we've endured over the last three months regarding our business – one of the great retail businesses of the present time.

98.     Second, the Company announced that its Board had authorized a share repurchase of $750 million. Third, the Company announced an 18% increase in its dividend.

99.     In March of 2016, Defendants made a number of additional statements designed to reassure the market that the credit portfolio was strong and the Company's reserves were accurately stated. For instance, during a March 24, 2016 conference call to discuss fourth quarter 2015 earnings, Defendant Santana emphasized again that "We have provided and operated in-house credit for 30 years, and it gives us a number of competitive advantages," that the "credit program is designed for rapid repayment that minimizes risk," and that the Company's "underwriting standards are proven and have been consistent." Santana further stated that "the visibility that we have into our credit portfolio performance which includes daily collections, weekly roll rates to 30, 60 and 90 days and other meaningful indicators leads us to remain highly confident in the strength of our credit portfolio performance." The Company discussed its improved credit metrics that had been pre-released, with Santana stating that the Company's "year-end valuation allowance and nonperforming metrics improved as management had expected, compared to the third quarter. This improvement was driven not only by the normal seasonality we customarily see, but also due to excellent credit execution and credit marketing initiatives designed to favorably influence credit receivable mix."

100.     In defending the Company's use of recency accounting, Santana stated that this approach accurately reflected the Company's true financial condition, and that switching to contractual accounting would make no difference: "In other words, the net charge-off to the balance sheet, and the net bad debt expense in the P&L would be the same under both recency and contractual aging. There is no difference between the two when it comes to our financial statements." The Company also pointed to additional disclosures in its Form 10-K, including disclosures expanding on the manner in which Signet used the recency method, and a disclosure showing that the weighted average FICO score of the credit portfolio was 662, higher than the 640 score that is generally considered to be subprime.

101.     The market reacted favorably to these statements. Cowen & Company reported that "management commented that excellent credit team execution & credit marketing initiatives designed to favorably influence credit receivable mix helped to drive the improvement [in the

Sterling in-house credit portfolio]," and J.P. Morgan reported that improved fourth quarter credit metrics should "assuage[e] concerns that had been weighing on the stock following a 3Q increase in mix driven bad debt expense. [] Importantly, this update should put the bear thesis to rest for now regarding concerns for worsening credit metrics given a moderating credit environment." On March 28, an analyst from Buckingham Research Group stated that, "we are more confident that there is no 'smoking gun' to come from SIG's credit operations," while issuing a "BUY" rating for the Company's stock.

## **THE TRUTH BEGINS TO LEAK OUT**

102.    The full truth about Signet's toxic loan portfolio was not revealed until well after the end of the Relevant Period, and was disclosed to investors on a piecemeal basis, with information leaking into the market through a series of partial corrective disclosures.  During the Relevant Period, partial corrective disclosures of Signet's fraud occurred on November 24, 2015 (discussed above), May 26, 2016; and June 2, 2016. Post-Relevant Period, further partial disclosures occurred, starting in August 2016, which further confirmed the falsity of Signet's representations.

> **A.    Contradicting Their Prior Representations About The Strength Of The Credit Portfolio, Defendants Announce That Signet Has Retained A Third Party To Review The Portfolio, And Is Considering Selling It**

103.    On May 26, 2016, Signet reported earnings for the first quarter of fiscal year 2017.[2] While the Company's press release touted its "record first quarter earnings," the results were mixed. Signet fell short of consensus estimates for revenue but exceeded consensus estimates for its earnings per share by 1 cent. Continuing its efforts to boost its stock price, Signet announced that it had repurchased 1.1 million shares in the first quarter for $125 million.

104.    Significantly, contradicting Defendants' repeated and very recent statements emphasizing the strength and value of the credit portfolio, Signet's press release stated that its

---

[2] Signet's fiscal year operates on a different clock than the standard calendar.  As explained in the Form 10-K for 2014: "Signet's fiscal year ends on the Saturday nearest to January 31."  As a result, for Signet, "Fiscal 2015," refers to "the 52 week period ending January 31, 2015" – effectively, the 2014 calendar year.  Quarters are similarly shifted, with the "First Quarter 2016" starting as of February 1, *2015* and ending 13 weeks later.

management was "conducting a strategic evaluation of the Company's credit portfolio," which Light described in the press release as a "top priority." Signet further announced that it had hired a third-party, Goldman Sachs, to conduct this evaluation, and that it would "consider a full range of options with respect to its credit operations" – including a sale or outsourcing of what Defendants had told investors for years was a critical source of strength and a key competitive advantage for Signet. Notwithstanding the importance of this development. The press release vaguely stated that the "primary objective of this process will be to ensure Signet has an optimized business structure that enhances our ability to execute against our strategic objectives."

105.   The news that the Company was considering offloading its credit portfolio – and that the situation was serious enough that it had to hire a third party to analyze the book – was deeply concerning to investors because it followed years of Defendants' repeated assurances that the portfolio's credit quality was strong and low-risk, that the portfolio was a critical "competitive advantage" for the Company, and that Defendants were completely familiar with the portfolio based on their 30 years of managing it. Even more surprising, Defendants had spent the past several months vociferously repelling any suggestion that the credit portfolio was risky or problematic.

106.   On the conference call held on May 26, 2016 to discuss the Company's results, after Defendant Light reiterated generally that the Company was "considering a full range of options" as to its credit portfolio, analysts pressed Defendant Light for more detail on what the Company's actual "priorities" were for the review. Just as Signet did in its press release, Defendant Light obfuscated, stating that the Company was "going to look at it holistically," was "looking to see what opportunity is out there," was "talking to different type of constituents," and "we'll keep you up to speed."

107.   Multiple analysts reacted with surprise and concern. For instance, Deutsche Bank issued a report on May 26, 2016 stating that the news of the credit review was "a surprise to us, given the confidence in the importance of the credit book as the competitive advantage to engage with customers and maximize the sale opportunity."

108.    In response to the Company's disclosures, on May 26, 2016, Signet's stock price swiftly declined, falling more than 10% in a single day on very high trading volume. Specifically, Signet's stock price fell from a closing price of $108.37 per share on May 25, to a closing price of $97 per share on May 26, a decline of more than $11 per share, on trading volume of more than 9.3 million shares.

109.    At the same time that the Company announced the strategic review, Defendants also continued to defend the credit quality and performance of the credit portfolio, making a number of statements designed to assuage any investor concern created by the announcement. On the May 26 earnings call, Defendant Light stated that "our credit metrics in our credit portfolio are strong" and "are improving sequentially. . . . So, our credit metrics are strong." He added that, a "point I want you to take away is that we remain a growth story; a prudent, measured and profitable growth story."

110.    Similarly, Defendant Santana explained that the higher net bad debt provision "was driven by our higher receivables balance," and thus, was a function of increased sales, not credit deterioration. When asked again about "the reality of using the recency accounting methodology," she again represented that it accurately stated the Company's reserves, stating, "at the end of the day, regardless of recency or contractual, whatever method you are on, the financial results are going to yield the same answer. The provision will be the same, our bad debt expense will be the same."

111.    Defendants' attempts at mitigation involved false or misleading statements that perpetuated the fraud and the continued inflation of Signet stock.

112.    Then, on the morning of June 2, 2016, Grant's Interest Rate Observer published an article titled "Lending Clubbed" that suggested that Signet was overvalued because its business was in large part a consumer credit company, and its consumer credit portfolio was in poor condition. The article (which appeared in the June 3 print edition of Grant's Interest Rate Observer) reported:

> At first glance, the Signet credit portfolio would seem to be shipshape. Non-performing loans amounted to 3.6% of gross receivables on April 30, only 10 basis points higher than a year earlier. Second glance tells a different story. "Recency" is the name of the method that Signet elects to employ in accounting for credit delinquency. A layman might call it forgiving.

113.   The report suggested that Signet could be masking the true condition of its portfolio through its use of the recency method, and further noted that the "true condition" of the portfolio was evidenced by the fact that the number of American personal bankruptcy filings naming Signet as a creditor was skyrocketing, increasing by 19% in just 3 months:

> Thanks to Marc Cohodes, former portfolio manager of Copper River Partners and a current short seller of Signet, for identifying an alternative path to the true condition of Signet's credit portfolio. Just count bankruptcy filings, Cohodes suggests. Thus, in the three months of January through March, 3,274 American personal bankruptcy submissions named Signet or one of its brands as a creditor. Compare the 2,663 such listings in the fourth quarter 2015 and the 1,903 in the first quarter 2015.
>
> * * *
>
> For whatever reason, or set of reasons, Signet has just engaged Goldman Sachs to conduct a strategic review of its credit portfolio. It is concerning news, inasmuch as the finance division not only facilitates sales but is also a key contributor to company-wide operating margins.

114.   In response to the Grant's Interest Rate Observer article, on June 2, 2016, Signet's stock price quickly fell another 6.5%. That day, the stock price declined from a closing price of $98.73 on June 1, to a closing price of $92.23 on June 2, on trading volume of more than 11.5 million shares.

115.   Defendants did not reveal the truth in response to these disclosures.  In fact, the *day after* the Grant's Interest Rate Observer Report, Signet filed a Form 10-Q containing similar misrepresentations of credit quality and loan reserves as it had previously.

116.   Within weeks of the June 2, 2016 disclosure, Pennant sold its Signet position.

## POST-RELEVANT PERIOD EVENTS

### A.     Signet Is Forced To Tighten Its Underwriting Practices – Confirming It Made Prior Misrepresentations

117.    In approximately mid-2016 – around the same time that Goldman Sachs was brought in to conduct a "strategic review" of the credit operation, and unbeknownst to investors – Signet was forced to tighten its reckless underwriting practices.

118.    If Signet had been telling the truth from the start, there would not have been any credit practices to tighten – Signet's "conservative," "competitive advantage," and "high quality" credit portfolio should have already incorporated tight underwriting practices.

119.    According to the CAC:  Former Employee 7 described the Company's efforts to tighten its credit portfolio. From August 2011 until February 2017, Former Employee 7 was a Credit Authorizer based out of Signet headquarters in Akron, Ohio. Former Employee 7 processed credit applications. Former Employee 7 stated that in approximately mid-2016, credit guidelines became stricter and the Company made changes to the way it scored customer accounts. Thereafter, if a customer had a score at or below a certain level, it was "pretty much a definite termination of their account even if on the credit bureau [the customer] had only one bad marking on their last credit review." At one point, Former Employee 7 was closing at least five accounts a day based on the new changes the Company implemented.

120.    As a result of its tightened underwriting, Signet's sales growth, which to that point had been fueled by its high-risk lending, began to contract. In need of cash, Signet nearly doubled its credit facility. On July 18, 2016, Signet announced that it amended its credit agreement to increase its credit facility from $400 million to $700 million, while extending maturity dates as well.  Again, there should have been no need to tighten underwriting standards if Signet had been telling the truth from the start.

121.    On August 25, 2016, Signet announced extremely disappointing results for the second fiscal quarter 2017, as its sales growth had cratered due to the need to reign in its reckless underwriting. As its underwriting tightened, credit sales dropped. Signet reported that in-house

sales in the Sterling division were down 1.7%, its same store sales had decreased 2.3%, and its total sales had declined 2.6%. Signet's reported adjusted earnings of $1.14 per share were far below consensus estimates. Signet also lowered its fiscal 2017 same-store growth guidance from 2-3.5% growth to a 2.5-1.0% contraction, and revised the upper bound of its projected yearly earnings per share downwards from $8.23 to just $7.22.

122.    There should have been no sales growth tightening if Signet had been telling the truth.

123.    Simultaneously, the Company announced deteriorating credit metrics. Specifically, Signet reported that net bad debt expense rose 12% from the prior year, driven by higher receivable balances and an increase in non-performing loans. Total allowance for doubtful accounts also increased 12% from the prior quarter, while non-performing loans as a percentage of gross receivables increased more than 22%.

**B.    The SEC Questions The Company, And Signet Stonewalls**

124.    In 2016, the SEC began questioning the Company's disclosures concerning its use of recency accounting. On October 4, 2016, the SEC sent Signet a letter asking for detail on the Company's accounting practices. The SEC asked the Company why it did not disclose the dollar amount of accounts that were contractually delinquent, but which Signet nevertheless categorized as performing under its recency method:

> [T]ell us your consideration of disclosing the aging of accounts receivable on a contractual basis as compared to the aging of accounts receivable based on your recency-aging methodology as of each balance sheet date; i.e., the dollar amount of accounts that is contractually delinquent but still considered current or performing, based on your recency-aging methodology.

125.    In response to the SEC's questions, the Company stonewalled. In an October 18, 2016 letter to the SEC, Signet again offered a spate of generalities, asserting that the recency method allowed it "to provide outstanding customer service and build long-term relationships with its guests, while maximizing the use of our working capital." Signet also asserted that the

recency method "provides a more accurate reflection of its customers' performance relative to the ultimate collectability of the customer account," and that providing information about what the Company's delinquencies would look like under the contractual method "is not relevant or meaningful from a disclosure perspective."

126.   On March 9, 2017, the Company reported results for the fourth quarter of 2016. On the same day, the Company held a conference call to discuss these results. In a remarkable change, and unlike previous analyst calls, this call was moderated by Signet's head of investor relations, James Grant, and its non-executive Chairman of the Board of Directors, Todd Stizer.

127.   Stizer continued the defense of the Company's use of recency accounting – this time offering the excuse that Signet employed the method in order to enable its customers to maintain higher credit scores. Notably, in another about-face for the Company, Stizer also stated that Signet would switch to the contractual method if the Company kept the credit business. Stizer said specifically:

> [I]n regard to our credit business, we absolutely reject any notion that Signet manipulates either its numbers or its customers. The great American retail business was built on consumer credit provided by retailers. While we respect that this system is in transition, we are providing a valuable service for our customers, enabling them to celebrate life and express love. [] It is regrettable that the use of the recency aging method, a credit business management tool which we've applied in our credit business consistently and successfully for over 30 years, has been distorted by certain members of the financial community to advance their own narrative about our business. In reality, the recency method actually enables customers to better maintain their credit rating. And we are, after all, interested in serving our customers. That being said, should we decide to retain and optimize the in-house credit business, we will change to contractual aging.

## C.   Post-Relevant Period, Defendants Reveal That The Portfolio Contains Massive Amounts of Subprime Loans

128.   On May 25, 2017, the Company announced unexpectedly bad financial results as well as the sale of a portion of the credit portfolio, which gave investors new insight into Signet's lending operation. Significantly, the Company revealed that – even though it had been

considering selling its portfolio for one year – it had been able to sell only the "prime" portion of its credit portfolio to Alliance Data Services. This portion of the portfolio totaled $1 billion or approximately 55% of the total book. The remaining 45% of the loan book consisted of $700 million to $800 million in subprime loans. The Company had been unable to find a buyer for these toxic credits.

129.    The Company further announced that it was outsourcing the servicing of the subprime portfolio to two different credit servicers, Genesis and Progressive Leasing. Progressive would service the most risky portion of the subprime customers by offering them a so-called "lease to own" option. In other words, these customers were of such poor credit quality that they were only qualified to lease their jewelry rather than buy it on credit.

130.    Progressive, a virtual rent-to-own company that appeals to a credit-challenged customer base, was acquired by Aaron's, Inc., a brick-and-mortar rent-to-own company self-described as serving "both the unbanked and under-banked customer," 83% of which fall into the $15,000 - $50,000 per household income range.  According to an Aaron's press release discussing the Progressive acquisition, Progressive "offers point-of-sale lease and purchase programs to customers who do not qualify for traditional, FICO-based financing."

131.    During an investor call, Defendant Santana acknowledged that these most risky of customers comprised approximately 7% of the company's sales for the past several years, which amounted to about $125 million of the credit portfolio.

132.    On that conference call, analysts asked when the Company would be able to find a buyer for the $700 to $800 million worth of subprime loans in the portfolio. Defendants Light and Santana were unable to give any timeline, other than to concede that it would not be in 2017. In other words, there was no buyer in sight.

133.    These post-Relevant Period admissions confirmed that Defendants' prior representations about credit quality were false or misleading.  Contrary to Defendants' numerous prior public statements asserting that the credit book was strong and did not pose a material risk, on the conference call and in accompanying materials, they now stated that the purpose of the

transaction was to "substantially derisk[] our balance sheet" and "eliminate material credit risk from the balance sheet." Signet also confirmed that – after more than a year of defending its recency method as appropriate and transparent – it would finally switch to the contractual method for its subprime loans in October 2017.

134.   On March 14, 2018, Defendants made an announcement effectively admitting that the subprime portion of Signet's credit portfolio was severely overvalued, and its reserves understated.  The too-low reserves and the overvaluation of the credit portfolio existed during the Relevant Period.   This post-Relevant Period admission confirmed that Defendants' prior quantitative representations about credit quality were false or misleading.

### D.   Multiple Government Regulators Investigate Signet for Abusive And Deceptive Lending Practices

135.   On December 1, 2017, Signet disclosed that two government regulators were investigating Signet's lending practices for widespread violations of laws prohibiting abusive and deceptive lending practices.

136.   The Company also disclosed that, on September 6, 2017, Signet was notified that the CFPB's Office of Enforcement was "considering taking legal action against Signet" for violations of sections 1031 and 1036 of the Consumer Financial Protection Act of 2010 and the Truth in Lending Act, laws which are meant to regulate deceptive and abusive practices and protect consumers against inaccurate and unfair credit card practices. The violations at issue, according to Signet, related to its "in-store: credit practices, promotions, and payment protection products." The CFPB website includes nearly 600 complaints against Signet for, among other things, fake accounts set up through deceit and identity theft, and abusive collection practices – the polar opposite of "conservative" and "stringent" lending practices that Defendants' touted. According to the Company's December 1, 2017 Form 10-Q, the CFPB has given Signet the opportunity to submit a letter "present[ing] its position to the CFPB before an enforcement action is recommended or commenced."

137.    Signet's lending practices have also triggered an investigation by the New York Attorney General into "similar issues under its jurisdiction," the existence of which Signet also disclosed in its December 1, 2017 Form 10-Q for the first time.

138.    In January 2019, Signet settled with the CFBP and New York Attorney General, paying $11 million because of its deceptive and abusive lending practices.  In its press release announcing the settlement, the CFPB detailed numerous violations of law by Signet with respect to its lending practices:

> The Bureau's and the State's parallel investigations found that Sterling violated the Consumer Financial Protection Act of 2010 by opening store credit-card accounts without customer consent; enrolling customers in payment-protection insurance without their consent; and misrepresenting to consumers the financing terms associated with the credit-card accounts. The Bureau also found that Sterling violated the Truth in Lending Act by signing customers up for credit-card accounts without having received an oral or written request or application from them. The State of New York found that Sterling violated several provisions of state law.

139.    The CFPB (and NY State Attorney General) complaint concerned actions by Signet, before, during, and after the Relevant Period.

## ADDITIONAL SCIENTER ALLEGATIONS

140.    As set forth above and further below, numerous facts demonstrate that Defendants knew or, at minimum, recklessly disregarded that their statements were materially false and misleading.

141.    As noted above, Defendants repeatedly stated that they were intimately familiar with the Company's underwriting and the credit quality of its loan portfolio. For instance, Defendant Barnes stated that the loan portfolio was "a big important part of our business and one that we don't take lightly. We watch it very closely and we use it to really help drive the core of our business." Defendant Ristau stated that we "welcome the increasing use of our credit programs, as we have very definitive approval criteria and fully understand the credit risk and profitability of our decisions. We take great care in our decisions[.]" Defendant Light stated that he and other

senior executives were personally familiar with the portfolio because "we've been running a credit portfolio for well over 30 years." In its SEC filings, Signet repeatedly assured investors that "on an ongoing basis, management monitors the credit exposure," "[w]e closely monitor the credit portfolio," and Signet assessed the portfolio's quality "on a real-time basis." Given their detailed knowledge of Signet's credit operation, Defendants knew or recklessly disregarded that Signet was engaged in reckless underwriting and had generated several hundred million dollars' worth of high-risk subprime loans.

142.   According to the CAC: Former Employee 1 reported that Signet's senior management, including Defendant Light, were made aware of problems with the credit portfolio as far back as 2007 or 2008. As set forth above, Former Employee 1 reported that the credit risk department began issuing internal warnings as far back as 2007 or 2008 that the bad debt issue was a problem and the portfolio was in trouble, but nothing was really done. As Former Employee 1 stated, "the credit department had some major issues with the bad debt process, with how it used recency methods," particularly because the Company was booking sales that weren't actually generating real cash due to the borrower's inability to pay a meaningful portion of their loan. The problems with the loan portfolio were documented in regular internal reports that were ultimately shared with Defendant Light and Bob Trabucco. Further, there were regular bad debt meetings with executives, including Light and Trabucco, to discuss strategies to overcome expanding bad debt, low contact rates, and similar issues. As Former Employee 1 reported, at these meetings, the executives considered changing the Company's lending practices and adopting more stringent credit terms, but decided against it because it would harm sales.

143.   In addition, as detailed above, beginning in approximately November 2015, concerned investors repeatedly questioned Signet's underwriting and the credit quality of its loan portfolio, and criticized its recency methodology as opaque. In response, Defendants staunchly denied that there was a basis for any concern or criticism. Defendants called investor criticism of the Company's disclosures and business practices "bullying," and stated that any concern was "unwarranted, quite frankly." They further reassured investors that the Company's

underwriting remained stringent, the credit quality of the portfolio remained strong, and the Company's use of the recency method accurately reflected the health of the portfolio. At the same time, they undertook a series of machinations designed to prop up the Company's flagging stock price, including substantial buybacks, a dividend raise, and the announcement of a private equity investment. Just weeks after issuing these denials, Signet disclosed that its Board was considering selling the loan portfolio. Ultimately – contrary to Defendants' strident assurances of stringent underwriting and high credit quality – it was revealed that nearly half of the Company's loan portfolio consisted of risky subprime loans. The fact that Defendants issued repeated false denials when investors questioned their statements, while pulling "levers" to prop up the stock price, is significant evidence of scienter.

144.     The significance of the loan portfolio to Signet further supports an inference of scienter. As set forth above, Defendants routinely stated that the portfolio was a key enabler of sales, especially in the critical bridal segment, and was therefore an essential aspect of Signet's business model. Defendants constantly emphasized that the portfolio was a "competitive advantage" for Signet that set it apart from its peers. The loan portfolio grew to be approximately $1.8 billion in size, and was Signet's second largest asset, accounting for approximately 30% of its total assets. Given that the loan portfolio was critical to Signet's business model and an extremely important driver of the Company's operations and financial performance, Defendants' misstatements on this subject were at least reckless.

145.     The market's intense focus on the Company's credit operation also supports an inference of scienter. As set forth herein, given the importance of the credit operation to Signet's business, the market focused closely on the purported credit quality of the portfolio and the conservatism of Signet's underwriting. Because these issues were so important to the valuation of Signet's stock, Defendants made myriad public statements assuring investors that Signet's underwriting was, in fact, stringent and the credit quality of the portfolio was strong. As Defendant Ristau stated during the beginning of the Relevant Period, "Well, I couldn't do a presentation without talking about credit." In turn, analysts issued dozens, if not hundreds of reports

addressing this subject. In light of the attention that the market paid to this subject – and the fact that Defendants spoke reassuringly on this subject dozens of times – any failure by Defendants to ensure the accuracy of their repeated statements was severely reckless at minimum.

146.    Finally, Defendants' use of the recency aging methodology supports an inference of scienter under the circumstances of this case. As set forth above, recency is a disfavored method because it can be used to obscure the credit risk in a portfolio – and that is precisely how Defendants used it here. Despite repeated calls from the market and an inquiry from the SEC to provide delinquency numbers based on the contractual method, Defendants refused. It was not until the end of the Relevant Period that the reason became clear: because, contrary to Defendants' statements, nearly half of Signet's loan portfolio consisted of toxic subprime loans that posed a material concentration of risk to Signet. Signet employed the recency method for the very reason that investors questioned it – because the Company had something to hide.

## SIGNET MATERIALLY UNDERSTATED THE RESERVES FOR ITS LOAN PORTFOLIO, THEREBY MATERIALLY OVERSTATING ITS INCOME

147.    At each quarter, Signet was required to record in its publicly filed financial statements an "allowance for doubtful accounts," or "allowance for credit losses," also known as a reserve. The reserve represented the dollar amount of accounts receivable that, based on current evidence, were likely uncollectible. This was a key metric for investors because it reflected the health of the loan portfolio, which, as noted above, was fundamental to Signet's business. Further, reserve increases were charged dollar-for-dollar against Signet's pre-tax income, and directly impacted the Company's financial performance.

148.    Generally Accepted Accounting Principles ("GAAP") required that Signet recognize and disclose probable losses inherent in its loan portfolio prior to charging off accounts receivable when the loss is ultimately confirmed (i.e., the "loss confirming event"). Specifically, ASC 450, in conjunction with ASC 310, Receivables, required that the Company record allowances for uncollectible accounts receivable and related credit loss provisions when the following conditions existed:

a.    Information available before Signet's financial statements were issued or were available to be issued indicated that it was probable that a loan or group of loans had been impaired or a liability had been incurred at the date of the financial statements; and

b.    The amount of the loss was reasonably estimable (ASC 450-20 -25-2).

149.    Under GAAP, those conditions may be considered in relation to individual receivables or in relation to groups of similar types of receivables. If the conditions are met, allowances for losses shall be made even though the particular receivables that are uncollectible may not be identifiable. (ASC 310-10-35-9).

150.    Signet's use of the recency aging method and its related charge-off policy obscured and extended the time between when a loan was made and when the related receivable was ultimately charged off – a period of time known as the "loss discovery period." Signet required its credit customers to sign an agreement specifying minimum payment terms. Typically, a failure to comply with the minimum payment terms is an adverse fact that indicates that the prospect for an uncollectible account is greater. However, under the recency method, Signet permitted customers to make partial payments (as little as 75% of the agreed upon amounts) for the account to be considered as current.

151.    Therefore, a customer could be dropping further and further from its agreed upon payment schedule, but with these partial payments the account would be considered to be current under Signet's recency method. Post-Relevant-Period (October 2016) the SEC questioned Signet on its use of the recency method, indicating that it is not comparable to other market participants. Indeed, one impact of Signet's atypical recency method is to understate and/or mask true delinquency trends, as accounts may be shown as recency current but may actually be several payments contractually past due. Thus, while Signet reported figures for delinquent and non-performing loans in its SEC filings during the Relevant Period, these figures understated the

true number of delinquencies and non-performing loans the Company was experiencing, and obscured the true credit quality of the loan portfolio.

152.    Since the uncollectibility of an account receivable – and hence, the adequacy of a reserve – is confirmed when the account is charged off, a company's policy of writing off its accounts is significant. Signet's policy of writing off accounts receivable is to wait until the accounts become (a) more than 120 days aged on the recency method, and (b) more than 240 days aged on the contractual method.

153.    Thus, Signet's use of the recency method for aging accounts receivables defers the identification of an account as past due. Further, Signet's policy of not charging the loan off until it is both 120 days past due on a recency basis and 240 days past due on a contractual basis, significantly defers when the Company recognizes the "loss confirming event" (*i.e.*, the charge-off of the uncollectible account receivable). To illustrate, if a customer failed to make any payments on an account, it would take 30 days for that account to become one day past due, and then another 240 days for it to become 240 days past due – meaning that even in the case of a customer who made no payments it would take Signet nine months (270 days) before it wrote off the account.

154.    Notably, this 270-day minimum period could be extended if the customer made any partial payments under the recency method. Therefore, in all reality, Signet's accounting policy likely extended the loss-confirming period to at least one year

155.    Notwithstanding the fact that Signet had extremely lenient delinquency and charge off policies (which delayed the charge off of losses), Signet's reserves were still consistently less than the confirmed losses it recognized during the preceding twelve months. In other words, Signet's reserves for losses were consistently less than the actual charge-offs it had recorded on a smaller receivable portfolio during the preceding loss discovery period (*i.e.*, assumed twelve month period).

156.    For example, in Signet's third quarter of its Fiscal 2017 year, Signet had a recorded reserve of $133 million for its accounts receivable of $1.7 billion. Yet – even under its

very lenient recency method and its policy of not charging off accounts until they become 240 days past due on the contractual basis – Signet wrote off $195 million for the preceding one year period loan portfolio which was slightly smaller at $1.6 billion. This is strong evidence that Signet's reserves were understated by at least $62 million at the end of the Relevant Period. This is especially so given Signet's assertions that its underwriting and the performance of the portfolio did not change for many years – assertions which further demonstrate that at a minimum the probable uncollectible receivables (the reserve) and related loss experience should be the same as those which very recently occurred (the charge offs).

157.    Based on an estimated loss discovery period of one year, Signet failed to increase its reserves and related bad debt expense as of the end of each quarter in the Relevant Period in violation of GAAP. Consequently, Signet's reserves and bad debt expense were understated, and its pre-tax income was overstated, by material amounts throughout the Relevant Period

158.    The following table sets forth the understatements of Signet's reserves for each reporting period in the Relevant Period based on an estimated loss discovery period of one year. The cumulative amount by which Signet's reserve was understated ranged from $30 to $84 million.

| Fiscal Period: | Reserve reported by Signet (in millions): | Charge-offs reported by Signet for the preceding year (in millions): | Understatement of reserve and related bad debt expense (in millions) if cumulative understatement was recognized: |
|---|---|---|---|
| Q2 2014 | $89 | $120 | $31 |
| Q3 2014 | $90 | $125 | $35 |
| Q4 2014 | $98 | $128 | $30 |
| FY 2014 | $98 | $128 | $30 |
| Q1 2015 | $88 | $131 | $43 |

| Fiscal Period: | Reserve reported by Signet (in millions): | Charge-offs reported by Signet for the preceding year (in millions): | Understatement of reserve and related bad debt expense (in millions) if cumulative understatement was recognized: |
|---|---|---|---|
| Q2 2015 | $99 | $135 | $36 |
| Q3 2015 | $103 | $138 | $36 |
| Q4 2015 | $113 | $145 | $32 |
| FY 2015 | $113 | $145 | $32 |
| Q1 2016 | $103 | $150 | $47 |
| Q2 2016 | $116 | $156 | $40 |
| Q3 2016 | $122 | $165 | $43 |
| Q4 2016 | $130 | $174 | $44 |
| FY 2016 | $130 | $174 | $44 |
| Q1 2017 | $117 | $183 | $66 |
| Q2 2017 | $129 | $189 | $59 |
| Q3 2017 | $133 | $195 | $62 |
| Q4 2017 | $139 | $203 | $64 |
| FY 2017 | $139 | $203 | $64 |
| Q1 2018 | $127 | $210 | $83 |
| Q2 2018 | $114 | $198[3] | $84 |

[3] Unlike other balances presented in the table, this amount was derived by annualizing net charge- offs recorded during Signet's quarter ended July 29, 2017. This calculation change was made because Signet's Q2 2018 net charge-offs were based, in part, on the Company's significantly reduced "receivable balance evaluated for impairment". The receivable decrease resulted from Signet's May 25, 2017 reclassification of approximately $1 billion of its "receivable balance evaluated for impairment" to "Accounts Receivable held for sale", made in connection with the outsourcing of its loan portfolio.

159.    Likewise, the following chart reflects the percentage amounts by which Signet's quarterly income and earnings would have decreased at each reporting period in the Relevant Period if Signet had corrected its cumulative understatements of reserves and bad debt expenses.

| Fiscal Period: | Percentage decrease of reported quarterly operating income if cumulative understatement was recognized: | Percentage decrease of reported quarterly pre-tax income if cumulative understatement was recognized: | Percentage decrease of reported net income if cumulative understatement was recognized: | Percentage decrease of reported diluted earnings per share if cumulative understatement was recognized: |
|---|---|---|---|---|
| Q2 2014 | 29% | 29% | 30% | 30% |
| Q3 2014 | 68% | 69% | 69% | 67% |
| Q4 2014 | 11% | 11% | 11% | 11% |
| FY 2014 | 5% | 5% | 5% | 5% |
| Q1 2015 | 29% | 29% | 29% | 29% |
| Q2 2015 | 43% | 51% | 40% | 41% |
| Q3 2015 | 333% | 1874% | 1780% | 1429% |
| Q4 2015 | 10% | 10% | 9% | 9% |
| FY 2015 | 5% | 6% | 5% | 5% |
| Q1 2016 | 27% | 28% | 26% | 26% |
| Q2 2016 | 40% | 45% | 42% | 42% |
| Q3 2016 | 128% | 196% | 186% | 186% |
| Q4 2016 | 11% | 11% | 10% | 10% |
| FY 2016 | 6% | 7% | 6% | 6% |
| Q1 2017 | 31% | 33% | 29% | 29% |

| Fiscal Period: | Percentage decrease of reported quarterly operating income if cumulative understatement was recognized: | Percentage decrease of reported quarterly pre-tax income if cumulative understatement was recognized: | Percentage decrease of reported net income if cumulative understatement was recognized: | Percentage decrease of reported diluted earnings per share if cumulative understatement was recognized: |
|---|---|---|---|---|
| Q2 2017 | 49% | 55% | 47% | 47% |
| Q3 2017 | 194% | 321% | 238% | 274% |
| Q4 2017 | 16% | 17% | 14% | 17% |
| FY 2017 | 8% | 9% | 8% | 10% |
| Q1 2018 | 73% | 82% | 69% | 66% |
| Q2 2018 | 62% | 69% | 64% | 67% |

160.    Notably, an analysis of charge-offs subsequent to each reporting period confirms the understatement of Signet's reserves. The following table compares each respective reserve to the confirmed losses realized over the relevant, average discovery period (*i.e.*, the subsequent twelve month period):

| Fiscal Period: | Reserve reported by Signet (in millions): | Charge-offs reported by Signet for the subsequent year (in millions): | Understatement of reserve if cumulative understatement was recognized (in millions): |
|---|---|---|---|
| Q2 2014 | $89 | $135 | $46 |
| Q3 2014 | $90 | $138 | $49 |
| Q4 2014 | $98 | $145 | $47 |

| Fiscal Period: | Reserve reported by Signet (in millions): | Charge-offs reported by Signet for the subsequent year (in millions): | Understatement of reserve if cumulative understatement was recognized (in millions): |
|---|---|---|---|
| FY 2014 | $98 | $145 | $47 |
| Q1 2015 | $88 | $150 | $63 |
| Q2 2015 | $99 | $156 | $57 |
| Q3 2015 | $103 | $165 | $63 |
| Q4 2015 | $113 | $174 | $61 |
| FY 2015 | $113 | $174 | $61 |
| Q1 2016 | $103 | $183 | $79 |
| Q2 2016 | $116 | $189 | $73 |
| Q3 2016 | $122 | $195 | $73 |
| Q4 2016 | $130 | $203 | $73 |
| FY 2016 | $130 | $203 | $73 |
| Q1 2017 | $117 | $211 | $94 |
| Q2 2017 | $129 | $218 | $88 |

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

161.    Throughout the Relevant Period, Defendants made numerous materially false and misleading statements and omissions including those concerning: (1) the quality and risks of Signet's in-house credit portfolio and underwriting; and (2) the Company's financial performance and accounting, including its reserves and earnings.

A.    **Materially False And Misleading Statements And Omissions Concerning The Second Quarter Fiscal 2014.[4]**

162.    On August 29, 2013, Signet issued a press release entitled "Signet Reports Second Quarter Financial Results" (the "Second Quarter 2014 Press Release"). That same day, the Company filed with the SEC a Form 8-K (the "Second Quarter 2014 Form 8-K"), which Defendant Ristau signed, that included the press release as an exhibit. The Second Quarter 2014 Press Release and the Second Quarter 2014 Form 8-K reported net income of $67.4 million, operating income of $105.5 million, income before taxes of $104.5 million, and diluted EPS of $0.84.

163.    The financial results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 30%, its operating income was overstated by 29%, its income before taxes was overstated by 29% and its diluted EPS was overstated by 30%, as set forth above.

164.    Later on August 29, 2013, Signet filed with the SEC its Form 10-Q for the quarter ended August 2, 2013 (the "Second Quarter 2014 Form 10-Q"), which was signed by Defendant Ristau and Defendant Barnes. The Second Quarter 2014 Form 10-Q reported the same financials set forth in the Second Quarter 2014 Press Release and the Second Quarter 2014 Form 8-K, and additionally reported allowance for credit losses of $89.1 million, a 7.2% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $57.8 million.[5]

165.    These metrics were materially understated by the amounts and for the reasons set forth above.

166.    Also on August 29, 2013, Defendants held a conference call with investors to discuss Second Quarter fiscal 2014 results (the "Second Quarter 2014 Conference Call"). During the Second Quarter 2014 Conference Call, Defendants made additional misleading

---

[4] Plaintiffs do not assert federal claims as to these statements, but do assert claims under state law.
[5] In its SEC filings, Signet did not provide specific figures for net bad debt expense. The Company provided figures for "Provision" and "Recoveries," and stated that "net bad debt expense is equal to provision expense less recoveries." The net bad debt expense numbers provided throughout were calculated using the formula provided by the Company in its SEC filings.

statements regarding the health of Signet's loan portfolio. Specifically, Defendant Ristau responded to an analyst's question regarding the increasing bad debt and whether there were "any issues with [the] customer mix and maybe the ability to pay[.]" Ristau stated that he

> wouldn't say there is any issue with our consumers' ability to pay. Our overall credit portfolio statistics continue to remain very strong and I want to make sure that you understand that point. When we look at the bad debt issue again, about 75% of it, so, in the quarter, we had a $5 million increase in our bad debt, about $3.5 million, $3.6 million of it is directly traceable to increases in the volume, with the residual being comprised of several things. . . . But I don't think there is anything wrong with our consumers' ability to pay. Consumers are behaving strongly. They are making more than the minimum down payments very strongly. They are using the credit appropriately. Our credit approval rates remain relatively consistent to prior year, so there is no big change in anything that we are doing there. So I don't want to cause any alarm, but I do want to properly describe the situation. It is mostly volume with some tweaks, if you will, in the collection profile primarily caused by the change in these programs.

167.    These statements were materially misleading. Contrary to the statement that "overall credit portfolio statistics continue to remain very strong," the portfolio contained several hundred million dollars' worth of high-risk subprime loans. Further, it was misleading to state that there were no issues with consumers' ability to pay, because the Company had granted several hundred million dollars' worth of subprime loans to consumers who posed a significant risk of default. It was also misleading to cite bad debt expense as an indication of strong credit quality because that figure was materially understated.

## B.    Materially False And Misleading Statements And Omissions Concerning The Third Quarter Fiscal 2014[6]

168.    On September 10, 2013, Defendants participated in a New York Investor Day (the "2013 Investor Conference") in New York, New York. During the 2013 Investor Conference, Defendants made false and misleading statements regarding Signet's credit portfolio. In response to an analyst question regarding factors pressuring Signet's margins, Defendant Ristau stated that

---

[6] Plaintiffs do not assert federal claims as to these statements, but do assert claims under state law.

> [w]e have had some margin pressure as a result of our credit operation percentage of bad debt percentage, not because of any change in the quality of the portfolio or consumer behavioral this is changes. That has all been very, very strong and the portfolio continues to be very healthy. But just the simple size of the receivable growing. Due to the penetration growing our receivable grew last quarter by about 11.9%, which is higher than the growth rate of sales. So we did experience the bad debt percentage increasing as a percentage of sales slightly. But again, that is mostly driven by volume and growth in the receivable balance. So we think that all of the indicators are under good control and we look forward to get to the second half of the year having a good result.

169.    This statement was materially false and misleading. Contrary to the statement that the "quality of the portfolio" was "very, very strong and the portfolio continues to be very healthy," the portfolio contained several hundred million dollars' worth of high-risk subprime loans.

170.    Also during the 2013 Investor Conference, Defendant Ristau responded to an analyst question whether Defendants view Signet's credit portfolio as a "competitive advantage". In response, Defendant Ristau stated that

> We believe [the credit business] is a very competitive advantage of our business. We do run our own credit operation. We are very, very strong operators of that particular segment of our business, we have been at it for 40 or 50 years, we are best-in-class operators of running a private label credit operation. [The private label credit operation] is <u>very stringently controlled</u>, it is a very important part of our business particularly as it helps to facilitate the sale of bridal product.

Ristau further emphasized that the portfolio was "<u>very stringently managed</u>," stating that it "it is a very important part of our business, <u>it is very well managed, it is very conservatively managed</u>. From a credit granting perspective about 50% of the people who apply for credit are granted credit. <u>So it is very stringently managed from a credit criteria perspective</u>."

171.    These statements were false and misleading. Contrary to the statements that Signet was a "best-in-class operator[] of running a private label credit operation," and that the Company's credit program "is very stringently controlled," "very conservatively managed," and "very

stringently managed," the Company engaged in extremely risky lending practices that generated several hundred million dollars' worth of high-risk subprime loans. These statements were also false and misleading because, per the Former Employees, in fact Signet was granting credit to effectively all-comers, and not turning away 50% of those who applied.

172.    Also during the 2013 Investor Conference, Defendant Barnes stated, regarding the credit business, that:

> we manage it so well. And we manage it for that consumer especially and we manage it to drive our sales. And the problem with outsourced credit is that the objectives don't necessarily line up with our objectives. [] [I]t really is a sales driving technique that we have and we have run it very well and we've proven ourselves through good times and bad on how we operate the credit facility that we do run. But we feel like it is a huge competitive strength for us and something that will continue to help drive our business going forward.

173.    Similarly, later on the conference call, Barnes stated that

> [w]e don't go out there, we don't push the credit , we don't change the way that we measure in terms of do you get credit, do you not get credit. We will never cross that line. But because of the fact that it is so well-managed we're still gaining a lot of traction, bringing in a lot of new customers."

174.    These statements were materially misleading. Contrary to the statements that Signet's credit operation was "so well managed," and that the Company did not "push credit," the Company engaged in extremely risky lending practices, including aggressively pushing credit on its customers, which generated several hundred million dollars' worth of high-risk subprime loans.

175.    On November 26, 2013, Signet issued a press release entitled "Signet Reports Third Quarter Financial Results" (the "Third Quarter 2014 Press Release"). That same day, the Company filed with the SEC a Form 8-K (the "Third Quarter 2014 Form 8-K"), which Defendant Ristau signed, that included the press release as an exhibit. The Third Quarter 2014 Press Release and the Third Quarter 2014 Form 8-K reported net income of $33.6 million,

operating income of $51.6 million, income before taxes of $50.7 million and diluted EPS of $0.42.

176.    The financial results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 68%, its operating income was overstated by 68%, its income before taxes was overstated by 69% and its diluted EPS was overstated by 68%, as set forth above.

177.    On November 26, 2013, Signet also filed with the SEC its Form 10-Q for the quarter ended November 2, 2013 (the "Third Quarter 2014 Form 10-Q"), which was signed by Defendant Ristau and Defendant Barnes. The Third Quarter 2014 Form 10-Q set forth the same financials stated above. The Third Quarter 2014 Form 10-Q also reported allowance for credit losses of $89.6 million, a 7.5% valuation allowance as a percentage of gross receivables, and $92.9 million of year-to-date net bad debt expense.

178.    These metrics were materially understated by the amounts and for the reasons set forth above.

**C.    Materially False And Misleading Statements And Omissions ConcerningThe Fourth Quarter And Full Fiscal Year 2014**

179.    On January 9, 2014, Signet held a conference call with investors to discuss holiday sales results. In response to analyst questions regarding the credit penetration rate and credit approval rates for the holiday season, Defendant Ristau stated: "Penetration rates were good. They were up slightly. Our approval rate was consistent. So the credit program continues to function very well. [] We'll update you on that when we have the fourth quarter, but it was up slightly.[7]

180.    This statement was materially false and misleading. Contrary to the statement that the "credit program continues to function very well," the Company's extremely risky lending to large numbers of subprime borrowers created a material risk to the Company.

---

[7] Plaintiffs do not assert federal claims as to this January 2014 statement, but do assert claims under state law.

181.    On March 27, 2014, Signet issued a press release entitled "Signet Reports Fourth Quarter and Fiscal 2014 Results" (the "Fourth Quarter 2014 Press Release"). On that same day, Signet filed with the SEC a Form 8-K (the "Fourth Quarter 2014 Form 8-K"), which Defendant Ristau signed, that attached the press release as an exhibit. In the Fourth Quarter 2014 Press Release and the Fourth Quarter 2014 Form 8-K, Signet reported fourth quarter diluted EPS of $2.18, net income of $175.2 million, operating income of $270.6 million, and income before taxes of $269.4 million.[8]

182.    The financial results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its fourth quarter net income was overstated by 11%, its operating income was overstated by 11%, its income before taxes was overstated by 11% and its diluted EPS was overstated by 11%, as set forth above.

183.    For the full fiscal 2014 year, the Company reported diluted EPS of $4.56, net income of $368 million, operating income of $570.5 million, and income before taxes of $566.5 million.

184.    The financial results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 5%, its operating income was overstated by 5%, its income before taxes was overstated by 5% and its diluted EPS was overstated by 5%, as set forth above.

185.    The same day, March 27, 2014, Signet filed with the SEC its Form 10-K for the fiscal year ended February 1, 2014 (the "Fiscal 2014 Form 10-K"), which was signed by Defendant Barnes and Defendant Ristau. The Fiscal 2014 Form 10-K repeated many of the same financials stated above. The Fiscal 2014 Form 10-K also reported allowance for credit losses of $97.8 million, a 6.7% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $138.3 million for the full fiscal year.

---

[8] For the statements made on March 27, 2014, and all subsequent statements, Plaintiffs assert both federal and state law claims.

186.    These metrics were materially understated by the amounts and for the reasons set forth above.

187.    The Fiscal 2014 Form 10-K – as well as Form 10-Ks filed through Fiscal Year 2016 – provided that The U.S. division:

- establishes credit policies that take into account the overall impact on the business. In particular, the U.S. division's objective is to facilitate the sale of jewelry and to collect the outstanding credit balance as quickly as possible, minimizing risk and enabling the customer to make additional jewelry purchases using the credit facility. In contrast, management believes that many financial institutions focus on earning interest by maximizing the outstanding credit balance[.]

188.    This statement was materially false and misleading. Contrary to the statement that the Company sought to "minimize risk" through its lending operation, in reality, Signet sought to drive loan volume through the use of reckless underwriting practices, through which the Company generated several hundred million dollars' worth of high-risk subprime loans, thereby creating a material concentration of credit risk.

189.    The Fiscal 2014 Form 10-K – as well as all subsequent Form 10-Ks filed throughout the Relevant Period – further provided that

> Signet does not require collateral or other security to support cash investments or financial instruments with credit risk; however it is Signet's policy to only hold cash and cash equivalent investments and to transact financial instruments with financial institutions with a certain minimum credit rating. Management does not believe Signet is exposed to any significant concentrations of credit risk that arise from cash and cash equivalent investments, derivatives or accounts receivable.

190.    This statement was materially false and misleading. Contrary to the statement that "[m]anagement does not believe Signet is exposed to any significant concentrations of credit risk that arise from cash and cash equivalent investments, derivatives or accounts receivable," Signet's management knew or, at the very least recklessly disregarded, that the Company's accounts receivable had a "significant concentration of credit risk" in the form of several hundred million dollars' worth of high-risk subprime loans. Indeed, Signet would eventually

state that it was selling its loan portfolio precisely in order to "eliminate material credit risk from the balance sheet."

191.    Later on March 27, 2014, Signet held a conference call with investors to discuss fourth quarter 2014 and full year fiscal 2014 earnings (the "Fourth Quarter 2014 Conference Call"). During the call, Defendant Barnes repeated many of the financials stated above.

192.    During the Fourth Quarter 2014 Conference Call, Defendants also made additional false and misleading statements meant to persuade investors that Signer's credit portfolio was strong and profitable. Specifically, regarding Signet's credit portfolio, Defendant Ristau further stated that the portfolio "continued its strong performance."

193.    This statement was false and misleading. Contrary to Defendants' statements that the credit portfolio "continued its strong performance," the portfolio was rife with several hundred million dollars' worth of high-risk subprime loans.

194.    During the call, Defendants also responded to analyst questions about Signet's credit portfolio. Specifically, a Sterne Agee analyst asked Defendants how investors "should [] be thinking about credit participation in 2014" and "receivable book growth as we model out 2014[.]" Defendant Ristau responded that

> the credit portfolio, as I indicated, continues to perform very strongly. We are very pleased with the overall performance of the portfolio. We have experienced last year some creeping increase in the participation and penetration rates because people just seem to like the program and the certainty of payments and they like to pay off their jewelry purchases quickly, which is what we always say is the benefit of our program. So I would expect that this year when you think about it that we will probably see some slow further increase in the penetration rate, nothing dramatic, but slow increase driven by our focus on bridal. Again, as you know, credit supports the bridal program very, very strongly and as high as 70% and maybe even a little higher as it keeps getting up there. So it is a very important part of supporting our bridal program, so that will drive it forward.
>
> And I think that the overall performance of the portfolio will remain stable, which I would describe as good to excellent. I mean it might get some creeping increase in the bad debt as a percentage

of sales again due to growth in the overall portfolio. Last year on an annual basis the growth in the portfolio should be I would guess somewhat similar, maybe a touch lower, but similar is the way to model it is what I would choose to do. And if the business gets stronger, it might go up a little bit, which would be a good thing. If the business is relatively consistent with last year, it would be about the same growth rate. I think that is how you should think about it. But the performance of that portfolio is very, very strong.

195.   These statements were false and misleading. Contrary to the statement that the "performance of that portfolio is very, very strong" and "good to excellent," the portfolio contained several hundred million dollars' worth of high-risk subprime loans.

**D.   Materially False And Misleading Statements And Omissions Concerning The First Quarter Fiscal 2015**

196.   On May 22, 2014, Signet issued a press release entitled, "Signet Reports First Quarter Financial Results" (the "First Quarter 2015 Press Release"). On that same day, Signet filed with the SEC a Form 8-K (the "First Quarter 2015 Form 8-K"), which Defendant Ristau signed, that attached the press release as an exhibit. The First Quarter 2015 Press Release and the First Quarter 2015 Form 8-K reported diluted EPS of $1.20, as well as net income of $96.6 million, operating income of $150.7 million, and income before taxes of $148.9 million.

197.   The financial results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 29%, its operating income was overstated by 29%, its income before taxes was overstated by 29% and its diluted EPS was overstated by 29%, as set forth above.

198.   On June 3, 2014, Signet filed with the SEC its Form 10-Q for the quarter ended May 3, 2014 (the "First Quarter 2015 Form 10-Q"). The First Quarter 2015 Form 10-Q reported the same financial results set forth above. The First Quarter 2015 Form 10-Q also reported allowance for credit losses of $87.8 million, a 6.4% valuation allowance of gross receivables, and year-to-date net bad debt expense of $22.3 million.

199.   These metrics were materially understated by the amounts and for the reasons set forth above.

200.     Regarding the health of the Company's credit portfolio, the First Quarter 2015 Form 10-Q, and all subsequent Form 10-Qs filed throughout the Relevant Period, provided that "[m]anagement does not believe Signet is exposed to any significant concentrations of credit risk that arise from cash and cash equivalent investments, derivatives or accounts receivable."

201.     This statement was materially false and misleading. Contrary to the statements that "[m]anagement does not believe Signet is exposed to any significant concentrations of credit risk that arise from . . . accounts receivable," Signet's management knew or, at the very least recklessly disregarded, that the Company's accounts receivable had a "significant concentration of credit risk" in the form of several hundred million dollars' worth of high-risk subprime loans, as evidenced by Defendants' comments. Indeed, Signet would eventually state that it was selling its loan portfolio precisely in order to "eliminate material credit risk from the balance sheet."

202.     On May 22, 2014, Defendants held a conference call with investors to discuss first quarter fiscal 2015 results (the "First Quarter 2015 Conference Call"). During the First Quarter 2015 Conference Call, Defendant Ristau stated that that the "US net bad debt expense to US sales ratio was consistent with the prior first quarter at 2.5% with the credit portfolio continuing to perform strongly. 96.7% of the portfolio is classified as performing versus 96.3% as of last year's fiscal 2014 year-end."

203.     This statement was materially misleading because the net bad debt expense cited by Ristau was materially understated, as set forth in herein. Further, contrary to the statement that the "credit portfolio continu[ed] to perform strongly," the portfolio contained several hundred million dollars' worth of high-risk subprime loans.

E.     **Materially False And Misleading Statements And Omissions Concerning The Second Quarter Fiscal 2015**

204.     On August 28, 2014, Signet issued a press release entitled, "Signet Jewelers Reports Second Quarter Financial Results" (the "Second Quarter 2015 Press Release"). On that same day, the Company filed with the SEC a Form 8-K (the "Second Quarter 2015 Form 8-K"), which

Defendant Santana signed, that attached the press release as an exhibit. The Second Quarter 2015 Press Release and the Second Quarter 2015 Form 8-K reported diluted EPS of $0.72, down 14.3% due to one-time expenses from the Zale acquisition, and organic EPS of $1.00. The Company also reported net income of $58.0 million, operating income of $83.5 million, and income before taxes of $69.8 million.

205.    The financial results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 40%, its operating income was overstated by 43%, its income before taxes was overstated by 51% and its diluted EPS was overstated by 40%, as set forth above.

206.    Thereafter, on September 10, 2014, Signet filed with the SEC its Form 10-Q for the quarter ended August 2, 2014 (the "Second Quarter 2015 Form 10-Q"), which was signed by Defendant Barnes and Defendant Santana. The Second Quarter 2015 Form 10-Q reported the same financials set forth above. The Second Quarter 2015 Form 10-Q also reported allowance for credit losses of $98.9 million, a 7% valuation allowance of gross receivables, and year-to-date net bad debt expense of $64.1 million.

207.    These metrics were materially understated by the amounts and for the reasons set forth above.

208.    In the Second Quarter 2015 Press Release Defendants made additional misleading statements concerning Signet's credit portfolio. For instance, the press release provided that

> The net bad debt as a percentage of the division's total sales increased to 3.7% in year to date Fiscal 2015 compared to 3.6% in year to date Fiscal 2014, driven primarily by growth in the outstanding receivable balance from increased credit penetration. The portfolio continues to perform strongly as evidenced by the allowance for doubtful accounts as a percentage of ending accounts receivable decreasing 20 basis points from 7.2% as of August 3, 2013 to 7.0% as of August 2, 2014.

209.    These statements were materially misleading. It was materially misleading to state that the "portfolio continues to perform strongly," and to point to the purportedly low allowance

figures as "evidence," when that allowance figure was materially understated, and the portfolio contained hundreds of millions of dollars' worth of high-risk subprime loans.

210.    On August 28, 2014, Defendants held a conference call with investors to discuss second quarter fiscal 2015 results (the "Second Quarter 2015 Conference Call"). During the conference call Defendants made additional misleading statements regarding Signet's credit portfolio. Specifically, Defendant Santana noted the year-over-year increase in the credit penetration rate from 57.1% to 60%, and attributed this increase

>   primarily to the credit decision engine improvements, higher outlet participation and strong guest acceptance of our credit offerings. We have recently invested in a new decision engine, which preserves credit requirements, but more accurately scores applications, which yields more qualified customers. . . . Operating improvements made to the decision engine have helped increase credit penetration without adversely affecting the net impact of bad debt.

211.    This statement was materially false and misleading. It was materially misleading to tout the new decision engine as yielding "more qualified customers" and increasing "credit penetration without adversely affecting the net impact of bad debt," when the Company's net bad debt figures were materially understated, and the Company was continuing to generate massive amounts of high-risk subprime loans.

## F.    Materially False And Misleading Statements And Omissions Concerning The Third Quarter Fiscal 2015

212.    On September 4, 2014, Signet participated in a Goldman Sachs Global Retailing Conference (the "Fiscal 2015 Retailing Conference"), during which analysts asked about the performance of the Company's credit book. Defendant Santana stated that

>   our credit portfolio continues to perform very strong. Our credit is a key enabler of our sales, and we really do view it as one of the competitive advantages we have. And the value that a credit customer brings to our Sterling Jewelers division is about 3.5 times that of a noncredit customer.

213.    This statement was materially misleading. Contrary to the statement that the "credit portfolio continues to perform very strong," the portfolio contained several hundred million dollars' worth of high-risk subprime loans.

214.    Also during the Fiscal 2015 Retailing Conference, Defendant Santana made materially misleading statements concerning operating changes the Company made to its credit decision mechanism, meant to assure investors that despite the increase in the credit penetration rate, the quality of Signet's borrowers remained strong. Santana specifically stated:

> One of the investments we recently had made was in our decision engine, and we've really been seeing the return on that investment. And in our last call, we talked about our credit penetration rate had increased up to 62%, and that really is driven by the investments we've made on the front end. <u>And our investment there</u> <u>maintains that credit quality that we absolutely have to be robust about.</u> But, what it does is it's a little bit more in terms of how it scores the accuracy of scoring an applicant. So, <u>we're pulling in more of these quality customers into our portfolio.</u>

215.    This statement was materially misleading. Contrary to Defendants' statement that the investment made in the credit decision engine "maintains that credit quality that we absolutely have to be robust about," Signet sought to drive loan volume through the use of reckless underwriting practices, and issued huge amounts of loans to high-risk subprime borrowers. Contrary to Defendants' statement that the Company was "pulling in more of these quality customers into our portfolio," the number of high-risk subprime loans in Signet's portfolio remained enormous throughout the Relevant Period.

216.    During the Fiscal 2015 Retailing Conference, Santana also relied on the Company's misstated allowance for doubtful accounts to convince investors that Signet's credit portfolio was healthy, stating that

> when we think about the performance of our credit portfolio, if you actually look at our allowance as a percentage of our accounts receivable, we actually had an improvement there of about 20 basis points over last year. So, it continues to perform strong, and I think there's great things to come from our credit portfolio.

217.    These statements were materially misleading. It was materially misleading to state that the "portfolio continues to perform strong," and to point to the purportedly low allowance figures as a credit quality indicator, when that allowance figure was materially understated and the portfolio contained hundreds of millions of dollars' worth of high-risk subprime loans.

218.    On November 25, 2014, Signet issued a press release entitled "Signet Jewelers Reports Third Quarter Fiscal 2015 Financial Results" (the "Third Quarter 2015 Press Release"). On that same day, the Company filed with the SEC a Form 8-K (the "Third Quarter 2015 Form 8-K"), signed by Defendant Santana, that attached the press release as an exhibit. The Third Quarter 2015 Press Release and the Third Quarter 2015 Form 8-K reported adjusted EPS of $0.21 and pre-adjusted loss per share of $0.02 due to transaction costs in relation to the Zale acquisition. The Company also reported a net loss of $1.3 million, operating income of $10.7 million, and a loss before taxes of $1.9 million.

219.    The results set forth above were materially misstated. Specifically, as a result of Signet's cumulative understatements of its reserve, its net loss was understated by 1780%, its operating income was overstated by 333%, its loss before taxes was understated by 1874% and its loss per share was understated by 1429%, as set forth above.

220.    The Third Quarter 2015 Form 8-K also reported an allowance for credit losses as a percentage of ending accounts receivable as 7.4% for year-to-date fiscal 2015. This metric was materially understated for the reasons set forth above.

221.    On December 8, 2014, the Company filed with the SEC its Form 10-Q for the period ending November 1, 2014 (the "Third Quarter 2015 Form 10-Q"), which was signed by Defendant Santana. The Third Quarter 2015 Form 10-Q reported the same financial results set forth above. The Third Quarter 2015 Form 10-Q also reported an allowance for credit losses of $102.6 million, a 7.4% valuation allowance as a percentage of gross receivables for the quarter, and year-to-date net bad debt expense of $105.8 million.

222.    These metrics were materially understated by the amounts and for the reasons set forth above.

223.    The Third Quarter 2015 Press Release and the Third Quarter 2015 Form 8-K contained additional misleading statements concerning the health of Signet's credit portfolio as related to its bad debt valuation allowance. For instance, in the Third Quarter 2015 Press Release, Defendants stated that the "portfolio performed strongly as evidenced by the allowance for doubtful accounts as a percentage of ending accounts receivable decreasing 10 basis points to 7.4% as of November 1, 2014 from 7.5% as of November 2, 2013."

224.    These statements were materially misleading. Like the statements Defendant Santana made earlier in the year at the Fiscal 2015 Retailing Conference, it was materially misleading to state that the "portfolio performed strongly," and to point to the purportedly low allowance figures as "evidence," when that allowance figure was materially understated, and the portfolio contained hundreds of millions of dollars' worth of high-risk subprime loans.

225.    On or about January 12, 2015, Signet participated in the ICR Xchange Conference in Orlando Florida.  For this conference, Signet provided a presentation, which included material misstatements or omissions, in particular, with respect to its credit portfolio, Signet stated: "We are focused on selling jewelry, not credit."; and that its credit system was "resilient." Signet made additional statements about its credit system, including that it was inhouse, and touted the credit system as a positive to the Company. These statements were materially misleading, as they failed to include that Signet's credit portfolio was of poor quality, was not well managed, and had poor underwriting standards.

226.    These statements were also false and misleading as Signet, in fact, was focused on selling credit as demonstrated by revelations of its low to nonexistent underwriting practices and guidelines, and by information from Former Employees that Signet was pushing credit.  It was materially misleading to state that credit was a competitive strength or that the portfolio was managed effectively, when credit was in fact a risk to the company, and the portfolio was being managed per poor to non-existent underwriting practices and guidelines.

**G.     Materially False And Misleading Statements And Omissions Concerning The Fourth Quarter And Full Fiscal Year 2015**

227.     On March 26, 2015, Signet issued a press release entitled "Signet Jewelers Reports Excellent Fourth Quarter And Strong Fiscal 2015 Financial Results" (the "Fourth Quarter 2015 Press Release"). On that same day, Signet filed with the SEC a Form 8-K (the "Fourth Quarter 2015 Form 8-K"), which Defendant Santana signed, that attached the press release as an exhibit. In the Fourth Quarter 2015 Press Release and Fourth Quarter 2015 Form 8-K, the Company reported diluted EPS of $2.84, net income of $228.0 million, operating income of $331.7 million, and income before taxes of $323.8 million for the fourth quarter.

228.     The results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its fourth quarter 2015 net income was overstated by 9%, its operating income was overstated by 11%, its income before taxes was overstated by 10% and its diluted EPS was overstated by 9%.

229.     For the full fiscal year, the Company reported diluted EPS of $4.75, net income of $381.3 million, operating income of $576.6 million, and income before taxes of $540.6 million.

230.     The results set forth above were materially misstated. Its full year net income was overstated by 5%, its operating income was overstated by 5%, its income before taxes was overstated by 6%, and its diluted EPS was overstated by 5%, as set forth above.

231.     Also on March 26, 2015, Signet filed with the SEC its Form 10-K for the year ended January 31, 2015 (the "Fiscal 2015 Form 10-K"), which was signed by Defendant Light and Defendant Santana. The Fiscal 2015 Form 10-K reported allowance for credit losses of $113.1 million, a 6.8% valuation allowance as a percentage of receivables, and year-to-date net bad debt expense of $160.0 million.

232.      These metrics were materially understated by the amounts and for the reasons set forth above.

233.     The same day, Defendants held a conference call with investors to discuss fourth quarter and full-year fiscal 2015 financials (the "Fourth Quarter 2015 Conference Call"). During

the conference call, Defendants made additional misleading statements concerning Signet's credit portfolio. Specifically, Defendant Santana stated that

> Operating improvements made to our decision engine have helped increase credit penetration and profit without adversely affecting the net impact of our bad debt for the full year. Now on a quarterly basis the net impact of bad debt and interest income was about flat and that's due primarily to the timing of recoveries which have been realized in the first quarter of fiscal 2016. The portfolio continues to perform very strongly for us and that's evidenced by the allowance as a percentage of our ending accounts receivable finishing nearly flat to last year.

234.    These statements were materially misleading. It was materially misleading to state that the improvements made to the decision engine "helped increase credit penetration and profit without adversely affecting the net impact of our bad debt," when the Company's net bad debt figures were materially understated, and the Company was continuing to generate massive amounts of high-risk subprime loans.

**H.    Materially False And Misleading Statements And Omissions Concerning The First Quarter Fiscal 2016**

235.    On May 28, 2015, Signet issued a press release entitled "Signet Jewelers Reports Strong First Quarter Financial Results" (the "First Quarter 2016 Press Release"). On the same day the Company filed with the SEC a Form 8-K (the "First Quarter 2016 Form 8-K"), which Defendant Santana signed, that attached the press release as an exhibit. The First Quarter 2016 Press Release and the First Quarter 2016 Form 8-K reported diluted EPS of $1.48, net income of $118.8 million, operating income of $176.2 million, and income before taxes of $165.2 million.

236.    The results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 26%, its operating income was overstated by 27%, it income before taxes was overstated by 28% and its diluted EPS was overstated by 26%, as set forth above.

237.    On June 3, 2015, Signet filed with the SEC its Form 10-Q for the quarter ended May 2, 2015 (the "First Quarter 2016 Form 10-Q"), which was signed by Defendant Light and Defendant Santana. The First Quarter 2016 Form 10-Q reported the same misstated financial results set forth, above. The First Quarter 2016 Form 10-Q also reported allowance for credit losses of $103.3 million, a 6.5% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $28.1 million.

238.    These metrics were materially understated by the amounts and for the reasons set forth above.

239.    Later on May 28, 2015, Defendants held a conference call with investors to discuss first quarter fiscal 2016 financials (the "First Quarter 2016 Conference Call"). During the call, Defendants repeated the financials set forth in the First Quarter 2016 Press Release, and made additional misleading statements concerning Signet's credit portfolio.

240.    Specifically, Defendant Santana again relied on the Company's valuation allowance to represent to investors that the Company's credit portfolio was performing well:

> Net bad debt expense for the quarter was $28.1 Million compared to $22.3, last year, an increase in $5.8 Million. And that was driven primarily by the growth in receivables balance from increased penetration and change in the credit program mix. Other operating income was $63.5 Million compared to $54m last year. This was an increase of $9.5 Million and is due primarily to more interest income on the higher outstanding receivables as well as the shift away from interest-free programs. So the net impact of these two items was income of $35.4 Million compared to $31.7 Million in the prior year or an increase of $3.7 Million. <u>Our portfolio continues to perform well as evidenced by the net impact of bad debt and other operating income as well as the allowance as a percentage of accounts receivable being fairly consistent.</u>

241.    This statement was materially false and misleading. It was materially misleading to state that the "portfolio continues to perform well," and to point to the purportedly low net bad debt and allowance figures as "evidence," when those figures were materially understated, and the Company's extremely risky lending to subprime borrowers had created a material risk to the Company.

242.    On or about June 24, 2015, Signet presented at the Signet Institutional Investor Conference in New York York, New York.  As part of that conference, Signet issued a slide presentation for "New York Investor Day".   In that presentation, Signet stated that they "effectively managed our credit portfolio" and stated that their in-house credit system was a competitive strength.   These statements were false or materially misleading; it was materially misleading to state that credit was a competitive strength when Signet's credit figures were materially understated, and the Company's extremely risky lending to subprime borrowers had created a material risk to the Company.

### I.    Materially False And Misleading Statements And Omissions Concerning The Second Quarter Fiscal 2016

243.    On August 27, 2015, Signet issued a press release entitled "Signet Jewelers Reports Second Quarter Financial Results" (the "Second Quarter 2016 Press Release"). That same day, Signet filed with the SEC a Form 8-K (the "Second Quarter 2016 Form 8-K"), signed by Defendant Santana, that included the press release as an exhibit. The Second Quarter 2016 Press Release and Second Quarter 2016 Form 8-K reported diluted EPS of $0.78, exceeding guidance for the quarter. The Company also reported pre-tax income of $89.7 million, net income of $62.2 million, and operating income of $100.8 million.

244.    The results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 42%, its operating income was overstated by 40%, its income before taxes was overstated by 45% and its diluted EPS was overstated by 42%, as set forth above.

245.    On September 3, 2015, the Company filed with the SEC its Form 10-Q for the quarter ended August 1, 2015 ("Second Quarter  2016 Form 10-Q"), which was signed by Defendant Light and Defendant Santana. The Second Quarter 2016 Form 10-Q reported the same financial results set forth above. The Second Quarter 2016 Form 10-Q also contained reported allowance for credit losses of $116.0 million, a 7.3% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $77.5 million.

246.    These metrics were materially understated by the amounts and for the reasons set forth above.

247.    On August 27, 2015, the Company held a conference call with investors to discuss its fiscal 2016 second quarter results (the "Second Quarter 2016 Conference Call"). On that call, Defendant Santana made misleading statements designed to ensure investors that the credit quality of the Company's consumer loan portfolio was strong and healthy.

248.    For instance, Defendant Santana made false and misleading statements regarding the Company's allowance for doubtful accounts as a percentage of accounts receivable: "The allowance as a percentage of AR of 7.3% increased over last year due to timing. That is, in Q2 last year accounts receivable grew due to the credit decision engine introduction; but the bad debt that would come with any AR growth lagged. So this created an unusually low percentage last year, which we are now lapping."

249.    This statement was materially false and misleading. It was false to state that the Company's prior allowance was "unusually low" when it was, in fact, materially understated.

**J.      Materially False And Misleading Statements And Omissions Concerning The Third Quarter Fiscal 2016**

250.    On November 24, 2015, Signet issued a press release entitled "Signet Jewelers Reports Third Quarter Financial Results" ("Third Quarter 2016 Press Release"). That same day, Signet filed with the SEC a Form 8-K ("Third Quarter 2016 Form 8-K"), which Defendant Santana signed, that included the press release as an exhibit. The Third Quarter 2015 Press Release and the Third Quarter 2015 Form 8-K reported diluted EPS of $0.19. The Company also reported net income of $15 million, operating income of $33.6 million, and income before taxes of $21.9 million.

251.    The financial results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 186%, its operating income was overstated by 128%, its income before taxes was overstated by 196% and its diluted EPS was overstated by 186%, as set forth above.

252.    Thereafter, on December 4, 2015, Signet filed with the SEC its Form 10-Q for the quarter ending October 31, 2015 ("Third Quarter 2016 Form 10-Q"), which was signed by Defendant Light and Defendant Santana. The Third Quarter 2016 Form 10-Q reported the same financial results set forth above. The Third Quarter 2016 Form 10-Q also reported allowance for credit losses of $122.2 million, a 7.8% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $130.6 million.

253.    These metrics were materially understated by the amounts and for the reasons set forth above.

254.    On November 24, 2015, Defendants held a conference call with investors to discuss third quarter fiscal 2016 results ("Third Quarter 2016 Conference Call"). Defendants repeated the results in the Third Quarter 2015 Press Release and the Third Quarter 2015 Form 8-K. On the call, Defendant Santana addressed Signet's credit portfolio and made misleading statements meant to quell market concern:

> Our credit approval standards remain disciplined and unchanged. The higher participation rate was primarily driven by a greater increase of Kay customers compared to our Jared customers. The average monthly collection rate was 11.7% compared to 12.1% due to two main reasons. First, as our mix or bridal increases due to our best in bridal strategy this creates a higher average receivable. By design the repayment rate is lower as the price point of the merchandise increases. Bridal has a higher average credit sale and therefore the repayment is longer, so this leaves a higher outstanding receivable to be collected. And second, like other consumer loans more principle is paid off later in the life of the loan. So as our credit portfolio has grown more in the last year proportionally more of it will be paid later. [] Importantly Signet has not changed its credit standards and our credit portfolio continues to perform well and profitably.

> Santana again stated later during the call that

> [n]o changes have been made in our credit standards and the bottom line is that small changes had a more pronounced impact in the third quarter as the third quarter is our smallest quarter but our credit earnings are earned more evenly throughout the year. [] We

<u>remain highly disciplined in our approval process and as a result
our credit portfolio continues to be profitable and stable.</u>

255.    These statements were materially false and misleading. Contrary to Defendants' statements that the Company's "credit approval standards remain disciplined and unchanged" and that Defendants "remain highly disciplined in our approval process," the Company sought to drive loan volume through the use of reckless underwriting practices. Further, contrary to Defendants' statements that the credit portfolio "continues to perform well and profitably," and "continues to be profitable and stable," the Company's reckless lending generated several hundred million dollars' worth of high-risk subprime loans that posed a material risk to Signet.

### K.    Materially False And Misleading Statements And Omissions Concerning The Fourth Quarter And Full Fiscal Year 2016

256.    On January 7, 2016, Defendants held a conference call with investors to discuss holiday results (the "Fiscal 2016 Holiday Conference Call"). Early in the call, Defendant Santana addressed Signet's credit operation, stating that

> [i]n-house credit has long been an important element of Signet's success and we are very proud of the significant sales and earnings the program has delivered in its 30-plus year history. Our credit program offers a competitive advantage for the company."
>
> She then again stated that the Company's credit portfolio is <u>"profitable and the performance in Q4 is very much in line with our expectations</u>."

257.    These statements were materially false and misleading. It was materially false and misleading to state that the portfolio was "profitable" when the portfolio contained hundreds of millions of dollars' worth of high-risk subprime loans with substantial unrecognized losses.

258.    Also during the Fiscal 2016 Holiday Conference Call, Defendant Santana made misleading statements meant to address market skepticism surrounding the Company's credit metrics for the third quarter of fiscal 2016. In response to an analyst question about the

possibility of outsourcing the credit business Santana stated that the "modest mix shift that we saw in Q3" that this

> as really magnified . . . given the small size of the quarter in Q3 which was only about 5% of our annual operating income. And that we had mentioned in Q4 the effect of that would be immaterial all of which was factored into our guidance at that point and continues to be factored into our guidance. The credit portfolio as I mentioned is performing exactly very much so in line with our expectations . We're very pleased with the performance. Early on the initiatives that we put forth to favorably influence that mix seem to be working in the right direction and again I just go back to our credit portfolio remains extremely profitable.

259.     These statements were materially misleading. Contrary to statements that the credit portfolio "is performing exactly very much so in line with our expectations," and that the "portfolio remains extremely profitable," the portfolio contained several hundred million dollars' worth of high-risk subprime loans with significant undisclosed losses.

260.     In addition to Defendant Santana's misleading statements regarding the health of Signet's credit portfolio, Defendant Light made statements meant to quell investor concern. Specifically, Defendant Light stated that

> I just wanted to reinforce something that Michele said and I think it's very important that everybody understands this. We've been running a credit portfolio for well over 30 years, well over 30 years and we've been through good times and bad times with the recession and we've been able to manage our accounts receivable appropriately and arguably better than most during all times within the last 30-plus years.
>
> So this credit as Michele said there's modest shifts going on but there's nothing that's unprecedented for us. So we have every confidence in the way we manage our credit portfolio. I just want to reinforce that because there seems to be some concerns about our credit portfolio, and the profitability of our credit portfolio. I just want to reinforce that because there seems to be some concerns about our credit portfolio and we  just think it's unwarranted quite frankly[.]"

261.   These statements were materially misleading. Contrary to the assurance that any "concerns about our credit portfolio" were "unwarranted," Signet had generated huge amounts of subprime loans that posed a material risk to the Company.

262.   Similarly, Santana added that, "so, I really hope with the comments that we mentioned today that it does help to put this credit discussion to minimize it where it should be." It was materially false and misleading for Santana to "minimize" concern over the credit portfolio because Signet had generated huge amounts of subprime loans that posed a material risk to the Company.

263.   On February 29, 2016, Signet issued a press release entitled "Signet Jewelers Announces Strong Fourth Quarter Preliminary Results" ("Preliminary Fourth Quarter 2016 Press Release"). On the same day, Signet filed with the SEC a Form 8-K ("Preliminary Fourth Quarter 2016 Form 8-K"), which was signed by Defendant Santana and attached the Preliminary Fourth Quarter 2016 Press Release as an exhibit. The Preliminary Fourth Quarter 2016 Press Release and Preliminary Fourth Quarter 2016 Form 8-K reported EPS of $3.42. The Preliminary Fourth Quarter 2016 Press Release and Preliminary Fourth Quarter 2016 Form 8-K also reported allowance for credit losses as 7.0% of gross receivables and a fourth quarter bad debt expense of $60 million.

264.   Signet's fourth quarter EPS was materially misleading because it was overstated by 10% as a result of Signet's understatements of its reserves. Further, Signet's allowance for credit losses and bad debt expense were materially understated for the reasons set forth above.

265.   Thereafter, on March 24, 2016, Signet issued a press release entitled "Signet Jewelers Reports Excellent Fourth Quarter and Fiscal 2016 Financial Results" ("Fourth Quarter 2016 Press Release"). On the same day, Signet filed with the SEC a Form 8-K ("Fourth Quarter 2016 Form 8-K"), which was signed by Defendant Santana and attached the press release as an exhibit. The Fourth Quarter 2016 Press Release and the Fourth Quarter 2016 Form 8-K reported diluted EPS of $3.42, net income of $271.9 million, operating income of $393.1 million, and income before taxes of $381.0 million for the fourth quarter. The Company also

reported allowance for credit losses of $130 million, a 7% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $190.5 million.

266.    These results were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 10%, its operating incoming was overstated by 11%, its income before taxes was overstated by 11% and its diluted EPS was overstated by 10%, as set forth above. Further, as set forth above, the Company's allowance for credit losses and bad debt expense were materially understated.

267.    For the full fiscal 2016 year, the Fourth Quarter 2016 Press Release and the Fourth Quarter 2016 Form 8-K also reported net income of $467.9 million, operating income of $703.7 million, income before taxes of $657.8 million, and diluted EPS of $5.87. For the full fiscal year, the Company reported net bad debt expense of $190.5 million.

268.    These results were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 6%, its operating incoming was overstated by 6%, its income before taxes was overstated by 7% and its diluted EPS was overstated by 6%, as set forth above. Further, as set forth above, the Company's net bad debt expense was materially understated

269.    Also on March 24, 2016, Signet filed with the SEC its Form 10-K for the fiscal year ended January 30, 2016 ("Fiscal 2016 Form 10-K"), which was signed by Defendant Light and Defendant Santana. The Fiscal 2016 Form 10-K repeated many of the same financial results stated above.

270.    The Fourth Quarter 2016 Press Release contained additional false and misleading statements regarding the Company's credit portfolio. Specifically, Defendant Santana is quoted as saying:

> Our consistency in underwriting is informed by our deep history of borrower behavior data which provides insights into payment patterns where customers have an emotional connection with their jewelry purchases. This provides us with a unique ability to underwrite effectively, capture incremental profitable sales, and develop lifetime customer relationships. [] We continue to be

confident in our credit portfolio performance and the competitive advantages associated with our in-house program.

271.    It was materially misleading to tout the Company's "unique ability to underwrite effectively" or that the in-house credit program was a "competitive advantage" when, in truth, Signet had engaged in reckless underwriting, thus generated hundreds of millions of dollars' worth of high-risk subprime loans.

272.    The Fourth Quarter 2016 Press Release further quotes Santana as defending the Company's use of the recency aging method, specifically that its

> use of the recency aging method optimizes collections and is aligned with our lending terms which require a qualifying payment defined as at least 75% of the scheduled monthly minimum payment and increases with delinquency level. It is important to understand that regardless of aging method, the balance sheet and income statement will yield the same result under US GAAP, as receivables must be stated at the net realizable value.

273.    These statements are materially false and misleading. It was false and misleading to represent that Signet's financial performance would not be affected by the proper application of GAAP, because Signet's financial statements were materially misstated in violation of GAAP.  The proper application of GAAP would have (and as the truth emerged, eventually did) alter the value of Signet's credit portfolio, as Signet's reserves were misstated, and the net realizable value was false and misleading under Signet's improper accounting.

274.    On March 24, 2016, Defendants held a conference call with investors to discuss these results (the "Fourth Quarter 2016 Conference Call"). Santana stated that the Company's

> "underwriting standards are proven and have been consistent over a long period of time. This consistency in our underwriting also is demonstrated in our weighed average FICO score for the portfolio. For FY16, our weighted average FICO was 662 and has been in the mid-660s for numerous years. The FICO scores of the new customers in our portfolio in FY 16 at 684 was higher than the average for the total portfolio."

275.    These statements were materially misleading. It was materially misleading to tout the supposed proven and consistent nature of Signet's underwriting and the prime FICO

scores of its customers, when the Company's underwriting was reckless, and the portfolio contained hundreds of millions of dollars' worth of high-risk subprime loans.

490.   Defendant Santana stated that

> regardless of aging method used over one's portfolio, the balance sheet and income statement will yield the same result, as under US GAAP receivables must be stated at the net realizable value. The net charge-off to the balance sheet and the net bad debt expense in the P&L would be the same under both recency and contractual aging. There is no difference between the two when it comes to our financial statements.

276.   These statements were materially misleading. It was false and misleading to represent that Signet's financial performance would not be affected by the proper application of GAAP, because Signet's financial statements were materially misstated in violation of GAAP. The proper application of GAAP would have (and as the truth emerged, eventually did) alter the value of Signet's credit portfolio, as Signet's reserves were misstated, and the net realizable value was false and misleading under Signet's improper accounting.

## L.   Materially False And Misleading Statements And Omissions Concerning The First Quarter Fiscal 2017

277.   In May 26, 2016, Signet issued a press release titled, "Signet Jewelers Reports Record First Quarter Earnings" ("First Quarter 2017 Press Release"). On the same day, Signet filed with the SEC a Form 8-K ("First Quarter 2017 Form 8-K"), signed by Defendant Santana, which attached the press release as an exhibit. The First Quarter 2017 Press Release and the First Quarter 2017 Form 8-K reported net income of $146.8 million, operating income of $212 million, income before taxes of $200.2 million, and diluted EPS of $1.87.

278.   These financial metrics were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 29%, its operating income was overstated by 31%, its income before taxes was overstated by 33% and its diluted EPS was overstated by 29%, as set forth above.

279.    These metrics were materially understated by the amounts and for the reasons set forth above.

280.    On May 26, 2016, Defendants held a conference call with investors to discuss first quarter fiscal 2017 earnings (the "First Quarter 2017 Conference Call"). During the First Quarter 2017 Conference Call, Defendants responded to analyst questions about outsourcing their credit portfolio. Defendant Light stated

> Our credit metrics in our credit portfolio are strong. As we said our credit metrics are improving sequentially and within our expectations and all we fought for and involved in our earnings guidance both on a quarterly basis and on an annual basis. So our credit metrics are strong. [] [T]he reason why we're doing this credit project, your point is, yes, we have had some good experience with ADS. We've had a full quarter now under our belt where ADS has been managing our entire credit portfolio for Zales from January through now, we're having some good experiences and we're learning more. [] [W]e're an evolving company. We're always looking for ways to better improve our business part of our business. That being said, we always feel there's ways of us getting smarter and understanding more about our
>
> business and we've also seen other major retailers out there, and I'm sure a lot of you know of them, that have carried internal receivables and have sold their receivables and have done work with receivables of recent and we've just understand [sic] there's an evolution going on and we want to make sure that we're on top of it. [] Credit is no different. We've done major credit analysis in the past. So as we mentioned, as I mentioned in our remarks, possible outcomes could be outsourcing of all of our credit functions, possible outcomes could be some in- housing of our credit functions, some would be outsourced.

281.    These statements were materially misleading. Contrary to the statements that the "credit metrics in our credit portfolio are strong," as a result of Defendants' reckless lending practices, the portfolio contained several hundred million dollars' worth of high-risk subprime loans that posed a material risk to Signet.

282.    During the First Quarter 2017 Conference Call, another analyst asked about accounts receivable aging and the "reality of using the recency accounting methodology" in terms of what Defendants are "seeing in your portfolio." Defendant Santana responded, stating:

> <u>Regardless of recency or contractual, whatever method you are on,</u>
> <u>the financial results are going to yield the same answer. The</u>
> <u>provision will be the same, our bad debt expense will be the same</u>.
> [] The reason why we use our recency is one, we have done it
> since the beginning of time. And it really has worked well for us
> over the years with the type of lending that we do, jewelry lending
> that emotional connection and it does optimize our collections for
> us. So with the use of recency it does help us to engage with the
> borrower, start collecting quicker. [] Now we will continue and
> when you see the 10-Q that we plan to file within the next week or
> so in the footnote you'll see the same type of a breakdown of our
> aging. So we've continued to provide the 30 day, 60, 90, etc.

283.   This statement was materially misleading. It was false and misleading to represent that Signet's financial performance would not be affected by the proper application of GAAP, because Signet's financial statements were materially misstated in violation of GAAP. The proper application of GAAP would have (and as the truth emerged, eventually did) alter the value of Signet's credit portfolio, as Signet's reserves were misstated, and the net realizable value was false and misleading under Signet's improper accounting.

## LOSS CAUSATION

284.   The market price of Signet's publicly traded common stock was artificially inflated by the material misstatements and omissions complained of herein.

285.   Defendants' misstatements and omissions concerning the Company's credit operation artificially inflated the price of Signet's stock. The artificial inflation in Signet's stock price was removed when the conditions and risks misstated and omitted by Defendants were revealed to the market. The information was disseminated through partial disclosures on November 24, 2015, May 26, 2016, June 2, 2016 (with effect continuing into June 3, 2016) which slowly, and only partially, revealed the nature and extent of the subprime quality of Signet's loan portfolio and its inadequate reserves. These disclosures, more particularly described below, reduced the amount of inflation in the price of Signet's publicly traded stock, causing economic injury to Plaintiffs.

286.   On November 24, 2015, Signet reported an earnings "miss." Defendants stated that higher net bad debt expense, which rose to $53 million compared to $41.7 million the year prior, had led to contracting margins. The increase in bad debt expense was a result of Defendants' reckless lending practices and the resulting increase in non-performing loans. These results caused investors to question the credit quality of Signet's loan portfolio and caused Signet stock to immediately fall 4%, dropping from $140.65 per share on November 23, 2015 to a closing price of $134.89 per share on November 24, 2015, on elevated trading volume of more than 4.6 million shares traded.

287.   Signet's November 24, 2015 disclosure partially corrected Defendants' prior materially misleading statements and omissions concerning the health of Signet's loan portfolio. This disclosure partially revealed the risk associated with the loan portfolio and called into question Defendants' representations about the profitability and quality of the portfolio. Notwithstanding that partially corrective information, Defendants' false statements and omissions continued to operate as a fraud on the market because the November 24, 2015 disclosure failed to disclose that: (a) Signet had engaged in reckless underwriting and had been systematically issuing loans to subprime borrowers to drive loan volume; and (b) Signet overstated its financial results by failing to properly reserve for delinquent loans in violation of GAAP.

288.   On May 26, 2016, Signet released first quarter fiscal 2017 earnings. At the same time, the Company also stated that it had hired Goldman Sachs to conduct a "strategic review" of Signet's loan portfolio. Defendants provided no significant detail concerning this review, only sharing with investors that they were considering all options, including a sale of the portfolio. In response to this news, Signet's stock price fell from a closing price of $108.37 per share on May 25, to a closing price of $97 per share on May 26, a decline of more than $11 per share, on trading volume of more than 9.3 million shares.

289.   Signet's May 26, 2016 disclosure partially corrected Defendants' prior materially misleading statements and omissions concerning the health and profitability of Signet's loan portfolio. These disclosures partially revealed the risk associated with the loan

portfolio and called into question both Defendants' representations about the quality of the portfolio, and Defendants' representations that the portfolio was underwritten conservatively. Notwithstanding that partially corrective information, Defendants' prior false statements and omissions continued to operate as a fraud on the market because the May 26, 2016 disclosure failed to disclose that: (a) Signet had engaged in reckless underwriting and had been systematically issuing loans to subprime borrowers to drive loan volume; and (b) Signet overstated its financial results by failing to properly reserve for delinquent loans in violation of GAAP.

290.    Early on June 2, 2016, Grant's Interest Rate Observer published an article titled "Lending Clubbed" that suggested Signet was an overvalued consumer credit company and that its consumer credit portfolio may contain significant amounts of risky loans. The Grant's report also surmised that the Company was using the recency-aging method of accounting to disguise the risk associated with the portfolio. In response to the Grant's Interest Rate Observer article, on June 2, 2016, Signet's stock price quickly fell another 6.5%. That day, the stock price declined from a closing price of $98.73 on June 1, to a closing price of $92.23 on June 2, on trading volume of more than 11.5 million shares. The Company's share price continued to fall on June 3, 2016, declining further to close at $88.19, again on elevated trading value.

291.    The June 2, 2016 disclosure partially corrected Defendants' prior materially misleading statements and omissions concerning the stability of Signet's loan portfolio and the quality of Defendants' underwriting standards. Notwithstanding that partially corrective information, Defendants' prior false statements and omissions continued to operate as a fraud on the market because the June 2, 2016 disclosure failed to disclose that: (a) Signet had engaged in reckless underwriting and had been systematically issuing loans to subprime borrowers to drive loan volume; and (b) Signet overstated its financial results by failing to properly reserve for delinquent loans in violation of GAAP.

292.    On June 2, after market, Jim Grant of Grant's Interest Rate Observer appeared on CNBC to further discuss the article published earlier in the day.

293.    On June 3, 2016, Signet's stock price continued to react to the report and the CNBC appearance. That day, the stock price declined from a closing price of $92.13 on June 2, to a closing price of $88.19 on June 3.

294.    In the alternative, on November 24, 2015, May 26, 2016, and June 2, 2016 (with effect continuing into June 3, 2016) there was a materialization of the otherwise hidden risk of the misrepresented credit quality of Signet's credit portfolio.  As this risk materializaed, Signet's stock fell.

295.    In addition, on November 24, 2015, May 26, 2016, and June 2, 2016 (with effect continuing into June 3, 2016), information correcting Signet's prior misrepresentations leaked into the market, but the full truth was not revealed on any of those dates individually, or in aggregate.  Signet leaked information into the market rather than reveal the full truth on a single day.  If Signet had revealed the full truth on a single day, on information and belief, Signet's stock would have suffered additional declines.

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

296.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

297.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Signet who knew that the statement was materially false or misleading when made.

# RELIANCE

## A. The Presumption of Reliance/Fraud on the Market

298.    Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omission of material fact that there was a duty to disclose.

299.    Plaintiffs are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Relevant Period:

    a.  Signet's common stock was actively traded in an efficient market on the New York Stock Exchange;

    b.  Signet's common stock traded at high weekly volumes;

    c.  As a regulated issuer, Signet filed periodic public reports with the SEC;

    d.  Signet was eligible to file registration statements with the SEC on Form S-3;

    e.  Signet regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

    f.  The market reacted promptly to public information disseminated by Signet;

    g.  Signet securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

    h.  The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Signet securities; and

    i.  Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs purchased or acquired Signet common stock

between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

300.   Accordingly, Plaintiffs relied, and are entitled to have relied, upon the integrity of the market prices for Signet's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Relevant Period.

**B. Actual Reliance**

301.   Plaintiffs, through Pennant, actually, read (or heard), reviewed, and relied upon Defendants' misrepresentations prior to purchasing Signet stock.

302.   Pennant began purchasing signet common stock for Plaintiffs in March 2014.

303.   Prior to purchasing Signet stock for Plaintiffs, one or more employees of Pennant actually read, reviewed and relied upon Signet's public disclosures, investor presentations and financial statements, including Signet's Forms 10-Q, Forms 10-K, and press releases.

304.   During the Relevant Period, employees at Pennant actually relied upon Signet's credit portfolio statements, including statements with respect to Signet's underwriting guidelines and practices, and quantitative data in, and as inputs for, constructing models, and relied upon those statements and the models (which included the statements by Signet) in deciding to purchase the stock.

305.   As Plaintiffs continued to purchase Signet stock throughout 2014, 2015, and 2016, Pennant kept abreast of publicly-disclosed developments concerning Signet, and prior to purchasing stock, as applicable, actually read (or heard), reviewed, and relied upon Signet's SEC filings, publicly released documents and Defendants' comments on calls and conferences, including but not limited to the following documents and items:

a.      Second Quarter 2014 Press Release
b.      Second Quarter 2014 Form 10-Q
c.      Second Quarter 2014 Form 8-K
d.      Third Quarter 2014 Press Release
e.      Third Quarter 2014 Form 8-K

f.      Third Quarter 2014 Form 10-Q
g.      Fourth Quarter 2014 Press Release
h.      Fourth Quarter 2014 Form 8-K
i.      Fiscal 2014 Form 10-K
j.      First Quarter 2015 Press Release
k.      First Quarter 2015 Form 8-K
l.      First Quarter 2015 Form 10-Q
m.      Second Quarter 2015 Press Release
n.      Second Quarter 2015 Form 8-K
o.      Second Quarter 2015 Form 10-Q
p.      Third Quarter 2015 Press Release
q.      Third Quarter 2015 Form 8-K
r.      Third Quarter 2015 Form 10-Q
s.      Fourth Quarter 2015 Press Release
t.      Fourth Quarter 2015 Form 8-K
u.      Fiscal 2015 Form 10-K
v.      First Quarter 2016 Press Release
w.      First Quarter 2016 Form 8-K
x.      First Quarter 2016 Form 10-Q
y.      Second Quarter 2016 Press Release
z.      Second Quarter 2016 Form 8-K
aa.     Second Quarter 2016 Form 10-Q
bb.     Third Quarter 2016 Press Release
cc.     Third Quarter 2016 Form 8-K
dd.     Third Quarter 2016 Form 10-Q
ee.     Fourth Quarter 2016 Press Release
ff.     Fourth Quarter 2016 Form 8-K
gg.     Fiscal 2016 Form 10-K
hh.     First Quarter 2017 Press Release
ii.     First Quarter 2017 Form 8-K
jj.     Statements from and accounts of the Second Quarter 2014 Conference Call
kk.     Statements from and accounts of the Third Quarter 2014 Conference Call
ll.     Statements from and accounts of the Fourth Quarter 2014 Conference Call
mm.     Statements from and accounts of the First Quarter 2015 Conference Call
nn.     Statements from and accounts of the Second Quarter 2015 Conference Call
oo.     Statements from and accounts of the Third Quarter 2015 Conference Call
pp.     Statements from and accounts of the Fourth Quarter 2015 Conference Call
qq.     Statements from and accounts of the First Quarter 2016 Conference Call
rr.     Statements from and accounts of the Second Quarter 2016 Conference Call
ss.     Statements from and accounts of the Third Quarter 2016 Conference Call

| tt. | Statements from and accounts of the Fourth Quarter 2016 Conference Call |
|---|---|
| uu. | Statements from and accounts of the First Quarter 2017 Conference Call |
| vv. | Statements from and accounts of the Fiscal 2015 Retailing Conference |
| ww. | Statements from and accounts of the September 10, 2013 Goldman Sachs Global Retailing Conference |
| xx. | Statements from and accounts of the October 8, 2013 New York Analyst Day |
| yy. | Statements from and accounts of the 2013 Investor Conference |
| zz. | Statements from and accounts of the September 4, 2014 Goldman Sachs Global Retailing Conference |
| aaa. | Statements from and accounts of the January 9, 2014 conference call |
| bbb. | Statements from and accounts of the January 12, 2015, ICR Xchange Conference in Orlando Florida |
| ccc. | Statements from and accounts of the June 24, 2015 Investor Day |
| ddd. | Statements from and accounts of the Fiscal 2016 Holiday Conference Call |

306.    Employees at Pennant actually relied upon Signet's credit portfolio statements and quantititaive data in updating models (and as updated inputs for those models), and actually relied upon Signet's statements, and the models (which included the statements by Signet) in deciding to purchase additional Signet stock.

307.    On May 26, 2016, employees of Pennant spoke directly with Signet management and received direct representations from the Company, including with respect to Signet's credit portfolio.  Pennant purchased stock on May 26, 2016, and on a date thereafter, at least in part in reliance on these statements.

308.    When purchasing Signet stock on behalf of Plaintiffs, Pennant actually read (or heard) and relied on each of the statements described above.

309.    Had Pennant known the truth, it would not have purchased Signet common stock on behalf of Plaintiffs or, if it had done so, would not have paid the price it did.

## CAUSES OF ACTION

## COUNT I

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER
**(Against All Defendants; for all statements from March 27, 2014 through June 2, 2016)**

310.    Plaintiff repeat and reallege the paragraphs above as if set forth herein.

311.    This Cause of Action is asserted against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

312.    Defendants both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of Signet common stock; and (iii) cause Plaintiffs to purchase Signet common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct Defendants took the actions set forth above.

313.    Defendants both directly and indirectly:  (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Signet common stock in an effort to artificially inflate and maintain the market prices for Signet common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

314.    By virtue of their high-level positions at the Company, the Executive Defendants were authorized to make public statements, and made public statements on Signet's behalf. These senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

315.    In addition, Defendants had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading, including information with respect to Signet's credit portfolio, so that the market price of the Company's securities would be based on truthful, complete and accurate information.

316.    Defendants acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them.  Defendants' material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Signet's credit from the investing public, including misstating the accuracy of Signet's financial statements, the health of the credit portfolio, the accuracy of the loss reserves, and the risk of the credit portfolio to Signet.  By concealing these material facts from investors, Defendants supported the artificially inflated price of Signet common stock.

317.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Signet's common stock.  In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Signet, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiffs purchased Signet common stock at artificially inflated prices.  As a series of partial but inadequate disclosures were issued, the price of Signet's securities substantially declined.

318.    At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known the truth with respect to the business, operations, performance and prospects of Signet, which was concealed by Defendants, Plaintiffs would not have purchased Signet common stock, or if they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

319.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

320.     As a direct and proximate result of Defendants, wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in the Company's securities.

321.     Taking into account, inter alia, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.), Plaintiff has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

**COUNT II**

**VIOLATIONS OF SECTION 18 OF THE EXCHANGE ACT**
**(Against All Defendants; with respect to the Forms 10-K Filed**
**March 27, 2014; March 26, 2015; and March 24, 2016)**

322.     Plaintiffs repeat and reallege each and every allegation above as if set forth herein.

323.     As alleged herein, Defendants made or caused statements to be made in Signet's Forms 10-K for the fiscal years ended February 1, 2014; January 31, 2015; and January 30, 2016 concerning Signet's credit portfolio, loss reserves, and risks to Signet from the credit portfolio, which statements were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, or omitted material facts whose omission rendered those statements false and misleading when made.

324.     In purchasing Signet common stock, Plaintiffs' investment team actually read, and had direct eyeball reliance on, Signet's Forms 10-K for the fiscal years ended February 1, 2014; January 31, 2015; and January 30, 2016 (to the extent each such document was on file with the SEC at the time).

325.     Specifically, Plaintiffs' investment advisor read and actually relied upon information regarding Signet's credit portfolio contained in Signet's Forms 10-K for the fiscal years ended February 1, 2014; January 31, 2015; and January 30, 2016 (to the extent each such document was on file with the SEC at the time) in making each purchase or acquisition set forth in the Exhibits on behalf of Plaintiffs.

326.    In ignorance of the falsity of Defendants statements and omissions, or of the true facts, Plaintiffs purchased Signet common stock in actual, eyeball reliance upon Defendants' representations.

327.    Defendants' materially false and misleading statements and omissions of material fact artificially inflated the price of Signet's common stock.

328.    Had they known the true facts, Plaintiffs would not have purchased Signet common stock and/or would not have purchased them at the inflated prices they paid.

329.    Upon the partial disclosure of the true facts, the prices of Signet common stock dropped, and Plaintiffs suffered damages in an amount to be proven at trial.

330.    By reason of the foregoing, Defendants are liable to Plaintiffs for violations of Section 18 of the Exchange Act, 15 U.S.C. § 78r.

331.    Taking into account, inter alia, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.), Plaintiff has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

## COUNT III

### VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against the Executive Defendants)

332.    Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

333.    To the extent that any of Executive Defendants are not found to be liable for any of the statements in the First and Second Causes of Action above, this Count is asserted in the alternative against the Executive Defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

334.    The Executive Defendants were at the time of the wrongs alleged herein each a controlling person of CBI within the meaning of Section 20(a) of the Exchange Act.

335.    As alleged herein, the Executive Defendants caused Signet to violate Sections 10(b) and 18 of the Exchange Act and Rule 10b-5 promulgated thereunder, by making material misstatements and omissions in connection with the purchase and sale of securities.

336.    The Executive Defendants had the power and influence, and did in fact exercise that power and influence, to cause Signet to issue the statements set forth above.

337.    As the CEOs or CFOs of Signet, the Executive Defendants were intimately familiar with, and exercised substantial control over, every aspect of Signet's business.  The Executive Defendants made numerous representations directly to investors about Signet, including its credit portfolio.

338.    By reason of the conduct alleged herein, Signet is liable for violations of Sections 10(b) and 18 of the Exchange Act and Rule 10b-5 promulgated thereunder, and the Executive Defendants are liable based on their control of Signet.

339.    The Executive Defendants culpably participated in Signet's violation of Sections 10(b) and 18 and Rule 10b-5, because they knew or recklessly ignored the true state of Signet's credit portfolio, lending standrads, loss reserves, and the risks of the credit portfolio to Signet.

340.    The Executive Defendants are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs for the substantial damages which Plaintiffs suffered in connection with their purchases of Signet common stock.

341.    Taking into account, inter alia, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.), Plaintiff has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

## COUNT IV

## COMMON LAW FRAUD
**(Against Defendants; for all alleged statements herein from
August 29, 2013, to June 2, 2016)**

342.     Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

343.     Defendants made, authorized or caused the representations and/or omissions set forth above.

344.     Those representations and omissions were material.

345.     The material representations set forth above were knowingly made by such Defendants with the intent to deceive, and such Defendants' representations omitted and concealed material statements of fact from Plaintiffs.

346.     Each such Defendant knew its representations were false and/or misleading, and their omissions were material and rendered their representations misleading, at the time they were made or omitted.

347.     Defendants knew that Plaintiffs would receive and rely on such representations, and intended that their false and/or misleading statements would induce Plaintiffs to purchase Ocwen common stock at inflated prices.

348.     Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions.  Plaintiffs would not have purchased Signet common stock at all, or at the prices they paid, had they known the true facts regarding Signet's credit portfolio.

349.     As a direct and proximate result of such reliance, and these Defendants' fraudulent misconduct, Plaintiffs have suffered damages.

350.     Plaintiffs could not have discovered the true facts until at least such time as corrective information entered the market and thus, where a discovery rule is applicable, Plaintiffs' cause of action did not begin to accrue until such time as corrective information placed them on notice of Defendants' fraud. Consequently, this action is timely.

351.     As applicable, taking into account, inter alia, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.), Plaintiff has brought this claim within the relevant statute of limitations period.  Consequently, this action is timely.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests relief and judgment, as follows:

    (a)    Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

    (b)    Awarding Plaintiffs punitive damages;

    (c)    Awarding Plaintiffs their attorneys' fees and costs; and

    (d)    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: March 27, 2019
       New York, New York

                LOWENSTEIN SANDLER LLP

            By:   /s/ *Lawrence M. Rolnick*
                    Lawrence M. Rolnick
                    Marc B. Kramer
                    Richard A. Bodnar
                    1251 Avenue of the Americas
                    New York, NY 10020
                    Tel. 212.262.6700
                    &
                    Thomas E. Redburn, Jr.
                    (*pro hac vice* forthcoming)
                    One Lowenstein Dr.
                    Roseland, NJ 07068